# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
## TAMPA DIVISION

UNITED STATES OF AMERICA, et al.,
*ex rel.* JAMES PEPIO

          Plaintiff,

v.

PROMETHEUS LABORATORIES, INC.,

          Defendant.

_____/

CASE NO.: 8:18-cv-2931-T-33AAS

Filed Under Seal Pursuant to
31 U.S.C. § 3730(b)(2)
Do Not Place in Press Box
or Enter on Publicly Accessible System

## AMENDED COMPLAINT AND DEMAND FOR JURY TRIAL

Relator JAMES PEPIO, by and through undersigned counsel, bring this action on the behalf of the UNITED STATES OF AMERICA, the STATE OF FLORIDA, against PROMETHEUS LABORATORIES, INC., ("Defendant") for violations of the Federal False Claims Act, 31 U.S.C. § 3729 *et seq.* and the State False Claims Act, as defined herein, to recover all damages, civil penalties and all other recoveries provided for under that act against Defendant and in support of their claims states as follows:

## JURISDICTION AND VENUE

1.     This is a civil action arising under the laws of the United States; specifically, the Federal False Claims Act, 31 U.S.C. § 3729 *et seq.* ("False Claims Act").

2.     This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §§ 1331, and 1345, and 31 U.S.C. § 3732 (a).

3.     Venue is also proper in this judicial district as all material events giving rise to these claims occurred in this judicial district.

## PARTIES

4.     Relator JAMES PEPIO is a resident of Hillsborough County, Florida.

5.     Plaintiff, the UNITED STATES OF AMERICA, is a party in this action.

6.     Plaintiff, the STATE OF FLORIDA, is a party in this action.

7.     Defendant PROMETHEUS LABORATORIES, INC. is a foreign corporation organized under the laws of California and has substantial operations throughout Florida and the United States.   The Relator worked for PROMETHEUS LABORATORIES, INC. throughout the State of Florida.

## GENERAL ALLEGATIONS

8.     Relator has satisfied all conditions precedent, or they have been waived.

9.     Relator has hired the undersigned attorneys and agreed to pay them a fee.

10.    Relator requests a jury trial for all issues so triable.

## THE FEDERAL FALSE CLAIMS ACT

11.    The Federal False Claims Act ("FCA"), 31 U.S.C. §§ 3729-3733, provides, *inter alia*, that any person who (1) "knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval," (2) "knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim," or (3) "conspires to commit a violation of [§ 3729(a)(1)]" is liable to the United States for a civil monetary penalty, adjusted for inflation plus treble damages. 31 U.S.C. § 3729(a)(1)(A)-(C).   Presently the minimum civil penalty per false claim is $11,181 and the maximum civil penalty per false claim is $22,363.  28 C.F.R. § 85.5.

12.     The terms "knowing" and "knowingly" are defined to mean "that a person, with respect to information (1) has actual knowledge of the information; (2) acts in deliberate ignorance of the truth or falsity of the information; or (3) acts in reckless disregard of the truth or falsity of the information." 31 U.S.C. § 3729(b)(1)(A)(i)-(iii). Proof of specific intent to defraud is not required. 31 U.S.C. § 3729(b)(1)(B).

13.     The term "claim" means "any request or demand, whether under a contract or otherwise, for money or property and whether or not the United States has title to the money or property, that (1) is presented to an officer, employee, or agent of the United States; or (2) is made to a contractor, grantee, or other recipient, if the money or property is to be spent or used on the Governments behalf or to advance a Government program or interest, and if the United States Government (a) provides or has provided any portion of the money or property requested or demanded; or (b) will reimburse such contractor, grantee, or other recipient for any portion of the money or property which is requested or demanded . . . ." 31 U.S.C. § 3729(b)(2)(A)(i)-(ii).

14.     "[T]he term 'material' means having a natural tendency to influence, or be capable of influencing, the payment or receipt of money or property." 31 U.S.C. § 3729(b)(4).

15.     Further, "[a]ny employee . . . shall be entitled to all relief necessary to make that employee . . . whole, if that employee . . . is discharged, demoted, suspended, threatened, harassed, or in any other manner discriminated against in the terms and conditions of employment because of lawful acts done by the employee . . . or associated others in furtherance of an action under [31 U.S.C. § 3730] or other efforts to stop 1 or more violations of this [False Claims Act]." 31 U.S.C. § 3730(h)(1).

16. "Relief [for unlawful retaliation] . . . shall include reinstatement with the same seniority status that employee, contractor, or agent would have had but for the discrimination, 2 times the amount of back pay, interest on the back pay, and compensation for any special damages sustained as a result of the discrimination, including litigation costs and reasonable attorneys' fees." *Id.* at § 3730(h)(2).

## STATE FALSE CLAIMS ACT

17. In response to federal incentives, most states have adopted laws the closely mirror the federal false claims act for moneys that have been defrauded.

18. The State of Florida, has adopted a state false claims act under which a *qui tam* relator may bring an action on behalf of the state to recover treble damages for Medicaid fraud in addition to statutory penalties. Fla. Stat. Ann. § 68.081, *et seq.*

## THE FEDERAL ANTI-KICKBACK STATUTE

19. The federal Anti-Kickback Statute (AKS), 42 U.S.C. § 1320a-7b(b), provides, in pertinent part:

> (2) Whoever knowingly and willfully offers or pays any remuneration (including any kickback, bribe, or rebate) directly or indirectly, overtly or covertly, in cash or in kind to any person to induce such person
>
>> (A) To refer an individual to a person for the furnishing or arranging for the furnishing of any item or service for which payment may be made in whole or in part under a Federal health care program, or
>>
>> (B) To purchase, lease, order or arrange for or recommend purchasing, leasing, or ordering any good, facility, service, or item for which payment may be made in whole or in part under a Federal health care program,

> Shall be guilty of a felony and upon conviction thereof, shall be fined not more than $25,000 or imprisoned for not more than five years, or both.

20.     Accordingly, manufacturers of products paid for in whole or in part by federal healthcare programs may not offer or pay any remuneration, in cash or in kind, directly or indirectly, to induce physicians or hospitals or others to order or recommend products paid for in whole or in part by Federal healthcare programs such as Medicare and Medicaid.

21.     The Patient Protection and Affordable Care Act (PPACA), Puhl. L No. 111-148, 124 Stat. 119 (2010), provides that violations of the AKS are per se violations of the FCA: "a claim that includes items or services resulting from a violation of this section constitutes a false or fraudulent claim for the purposes of [the False Claims Act]."

22.     The PPACA also clarified the intent requirement for the Anti-Kickback Statute, and provides that "a person need not have actual knowledge of this section or specific intent to commit a violation" of the AKS in order to be found guilty of a "willful violation."

## FEDERAL HEALTHCARE PROGRAMS

### A.     The Medicare Program

23.     Title XVIII of the Social Security Act, 42 U.S.C. §§ 1395 *et seq.*, establishes the Health Insurance for the Aged and Disabled Program, commonly referred to as the Medicare Program (the "Medicare Program" or "Medicare").

24.     The Medicare Program is comprised of four parts: Medicare Part A (hospital insurance); Medicare Part B (medical insurance); Medicare Part C (Medicare Advantage, formerly known as Medicare + Choice); and Medicare Part D (prescription drug coverage that

was enacted as part of the Medicare Prescription Drug, Improvement, and Modernization Act of 2003 ("MMA") and went into effect on January 1, 2006).

25.     Medicare Part A generally pays for inpatient services for eligible beneficiaries in hospitals, hospices and skilled nursing facilities, as well as some home healthcare services. 42 U.S.C. §§ 1395e - 42 U.S.C. §§ 1395i-5. Prescription drugs are covered under Medicare Part A only if they are administered on an inpatient basis in a hospital or similar setting.

26.     Medicare Part B covers some healthcare services and products not covered by Medicare Part A, generally on an outpatient basis.  Doctor's visits and other services are covered by Part B.  Medicare Part B also pays for some types of prescription drugs that are not administered in a hospital setting.  42 U.S.C. § 1395k(a); 42 U.S.C. § 1395x(s)(2); 42 C.F.R. § 405.517.  These typically include drugs administered by a physician or other provider in an outpatient setting, including some anticancer drugs.  42 U.S.C. § 1395k(a); 42 U.S.C. § 1395x(s)(2); 42 C.F.R. § 405.517.

27.     Medicare Part C, in effect, combines both Part A and Part B. Part C differs, however, because it is supplied through private insurance companies.  Medicare beneficiaries have the option to receive their Medicare benefits through private health insurance plans, instead of through the original Medicare plan (Parts A and B).  Originally, these programs were known as "Medicare+Choice" or "Part C" plans.  Following the passage of the MMA—which created Part D—"Medicare+Choice" became known as "Medicare Advantage" ("MA") plans.

28.     The Medicare Part D program ("Part D"), established by the Medicare Prescription Drug, Improvement, and Modernization Act of 2003, Pub. L. No. 108-173, 117 Stat. 2066, offers subsidized prescription drug insurance coverage, beginning on January 1,

2006. 42 U.S.C. § 1395w-101(a)(1). To obtain coverage, Medicare beneficiaries must take the affirmative step of enrolling in a Medicare Part D prescription drug plan that is either a free-standing prescription drug plan ("PDP") or a Medicare Advantage prescription drug plan ("MA-PD").

29.     Persons entitled to Medicare benefits under Part A or enrolled in Part B may enroll in a stand-alone Part D plan. 42 C.F.R. § 423.30.

30.     While some Medicare beneficiaries may choose not to enroll in a Part D plan, beneficiaries who are also eligible for Medicaid ("dual-eligibles") will have virtually no choice about participation as they will be automatically enrolled in a randomly selected Part D plan as of Fall 2005. Accordingly, Medicaid coverage for prescription drugs for dual-eligible persons ended on January 1, 2006.

31.     Only individuals and entities which have signed the required certifications concerning compliance with the requirements of the Medicare program, and are thereafter approved for participation, are assigned billing numbers and permitted to bill Medicare (these billing numbers are known as "Provider Identification Numbers," "CMS Certification Numbers" or "OSCAR numbers").

**B.     The Medicaid Program**

32.     Medicaid is a joint federal-state program that provides health care benefits for certain groups; primarily the poor and disabled. Each state administers its own Medicaid program, under federal regulations that generally govern what services should be provided, under what conditions.

33.     States develop plans for Medicaid programs that approved by the U.S. Department of Health and Human Services ("HHS") through the Centers for Medicaid and Medicare Services ("CMS"). 42 U.S.C. §§ 1396a(a)-(b). CMS monitors the state-run programs and establishes requirements for service delivery, quality, funding, and eligibility standards.

34.     The federal government provides a portion of each state's Medicaid funding. The portion provided is known as the Federal Medical Assistance Percentage ("FMAP") and is based on the state's per capita income compared to the national average. *See* 42 U.S.C. §§ 1396b(a)(1), 1903(a)(1).

## C.     TRICARE/CHAMPUS

35.     In 1967, the Department of Defense created the Civilian Health and Medical Program of the Uniformed Services ("CHAMPUS"), which is a federally funded medical program created by Congress. 10 U.S.C. § 1071. CHAMPUS beneficiaries include active military personnel, retired personnel, and dependents of both active and retired personnel. *Id.*

36.     In 1995, the Department of Defense established TRICARE, a managed healthcare program, which operates as a supplement to CHAMPUS. *See* 32 C.F.R. §§ 199.4, 199.17(a). The TRICARE Management Activity ("TMA") oversees this program. Since the establishment of TRICARE in 1995, both programs are frequently referred to collectively as TRICARE/CHAMPUS, or just "TRICARE."

37.     The TRICARE managed healthcare programs are created through contracts with managed care contractors in three geographic regions: North, South, and West. TRICARE health services are provided through both network, and non-network, participating providers. Providers who are Medicare-certified providers are also considered TRICARE-authorized

providers. TRICARE-authorized providers are either "Network Providers" or "Non-Network Providers."

38.    "Network Providers" include hospitals, other authorized medical facilities, doctors and healthcare professionals, all of whom enter into an agreement with the region's managed care contractor, and provide services for an agreed reimbursement rate. 32 C.F.R. § 199.14(a).

39.    "Non-Network Participating Providers" include hospitals, other authorized medical facilities, doctors and healthcare professionals who do not enter an agreement with the region's managed care provider, and are reimbursed at rates established by TRICARE regulations. *Id.*

40.    Just as with Medicare and Medicaid, TRICARE providers have an obligation to provide services and supplies at only the appropriate level and "only when and to the extent medically necessary." 32 C.F.R. § 199.6(a)(5) (requiring that services provided be "furnished at the appropriate level and only when and to the extent medically necessary," and such care must "meet[] professionally recognized standards of health care [and be] supported by adequate medical documentation . . . to evidence the medical necessity and quality of services furnished, as well as the appropriateness of the level of care.").

**D.    Federal Employee Health Benefits Program**

41.    The Federal Employee Health Benefits Program ("FEHBP") is a federally funded medical insurance program for federal employees, retirees, their spouses and unmarried dependent children under age 22, administered by the Office of Personnel Management ("OPM") pursuant to 5 U.S.C. §§ 8901, et seq.

42.    Through the OPM, the Government contracts with private health plans or "carriers" to deliver health benefits to its employees. Monies for the FEHBP are maintained in the Employees' Health Benefits Fund ("Health Fund"), and are administered by OPM. 5 U.S.C. § 8909. Federal agencies and their employees contribute to the Health Fund to cover the total cost of health care premiums. 5 U.S.C. § 8906. The monies from the Health Fund are used to reimburse the carriers for claims they pay on behalf of FEHBP beneficiaries.

43.    Like Medicare, Medicaid, and TRICARE, FEHBP will not cover any treatment or surgery that is not medically necessary. 5 U.S.C. § 8902(n)(1)(A).

## OFF-LABEL MARKETING

44.    The FDA regulates drugs based on the "intended uses" for such products. Before marketing and selling a prescription drug, a manufacturer must demonstrate to the FDA that the product is safe and effective for each intended use. 21 U.S.C. § 331(d); 21 U.S.C. §§ 355(a), 360b(a).

45.    The FDA reviews pharmaceutical manufacturers' applications for new drugs to determine whether the drugs are safe and effective for each intended use. See 21 U.S.C. § 355.

46.    Once a drug is approved for a particular use, doctors may legally prescribe the drug for any "non-indicated" or "off-label" purpose. Doctors may independently request information from drug manufacturers about such off-label uses. But with very few exceptions, the FDA prohibits drug manufacturers from marketing or promoting drugs for uses, *i.e.*, indications, not explicitly approved by the FDA. As described above, "off-label marketing" refers to the marketing of an FDA-approved drug for uses that have not undergone FDA scrutiny and approval.

47.     The approved uses of a drug will be summarized in what is commonly referred to as the "package insert". The package insert will also contain information on warnings and contraindications.

48.     Under the statute, qualified medical professionals may provide purely scientific medical information for uses other than those approved by the FDA; all other presentations, promotions and marketing to physicians for uses other than those approved by the FDA are considered off-label marketing or "misbranding" proscribed by the Food, Drug and Cosmetics Act ("FDCA"). See 21 U.S.C. §§ 331(a)-(b), 352(a), (f). This includes any attempts by a pharmaceutical sales representative to initiate discussions with, or solicit questions from, physicians concerning off-label use.

49.     Strong policy reasons exist for strict regulation of off-label marketing. Off-label promotion bypasses the FDA's strict review and approval process. It also removes the incentive to obtain definitive clinical study data showing the efficacy and safety of a product and, accordingly, the medical necessity for its use.

50.     Pursuant to the FDCA, 21 U.S.C. § 301, *et seq.*, the FDA strictly regulates the content of direct-to-physician product promotion and drug labeling information used by pharmaceutical companies to market and sell FDA-approved prescription drugs.

51.     FDA interprets "labeling" in its regulations broadly to include items that are "1) descriptive of a drug: 2) supplied by the manufacturer or its agents; and 3) intended for use by medical personnel." 21 C.F.R. § 202.1.

52.　　Labels—including brochures, booklets, detailing pieces, literature, medical reprints, sound recordings, exhibits and audio-visual material—are "misbranded" if they include misleading statements or if they omit material facts. 21 U.S.C. §§ 202.1 (l)(2), 321(n).

53.　　Courts have consistently held that oral statements made by a company's sales representative relating to a pharmaceutical product constitute commercial advertising or promotion. *See Abbott Labs. v. Mead Johnson & Co.*, 971 F.2d 6, 10 (7th Cir. 1992) (interpreting the Lanham Act).

54.　　Pharmaceutical promotional and marketing materials and presentations lacking in fair balance or that are otherwise false or misleading "misbrand" a drug in violation of the FDCA, 21 U.S.C. §§ 301, 321, 331, 352, 360b, 371; 21 C.F.R. §§ 202.1(e)(6), (e)(7); 21 C.F.R. § 1.21.

55.　　Just some specific examples of illegally misbranding an FDA approved drug include minimizing, understating, or misrepresenting the risks, contra-indications, and/or complications associated with the drug and/or referencing or promoting "off-label" uses of the drug, including expressly or implicitly promoting off-label uses and/or dosing regimens. *See* 21 C.F.R. § 202.1 (e)(4)–(7).

56.　　"Any promotion of a device for any indication not approved or cleared by the FDA and indicated on the label is considered an 'off-label' promotion and is unlawful." *U.S. ex rel. Nowak v. Medtronic, Inc.*, 806 F. Supp. 2d 310, 317 (D. Mass. 2011) (*citing* 21 U.S.C. § 331(d)). "The Ninth Circuit has considered this issue [of off-label promotion] and found that off-label promotion is unlawful." *Hawkins v. Medtronic, Inc.*, No. 1:13-CV-00499 AWI SK,

2014 WL 346622, at *7 (E.D. Cal. Jan. 30, 2014) (*citing Carson v. Depuy Spine, Inc.,* 365 Fed.Appx. 812, 815 (9th Cir.2010)).

57.     Under the FDCA, if the sponsor of a drug wanted to market that drug for an unapproved or off-label use, the sponsor was first required to submit to the FDA each additional proposed use, together with evidence, in the form of randomized and well-controlled clinical studies, sufficient to demonstrate that the drug was safe and effective for each additional proposed therapeutic use. The sponsor could not label or promote the drug for any new intended use without the prior approval of the FDA.

58.     The FDCA prohibits the distribution in interstate commerce of a misbranded drug. 21 U.S.C. § 331(a) and (k).

<b><u>COVERAGE OF OFF-LABEL DRUGS</u></b>

59.     By statute, Medicare will only reimburse claims for drugs if the drug is dispensed for a "medically accepted indication." *See e.g.,* 42 U.S.C. § 1395x (t); *see also* 42 U.S.C. § 1396r-8 (k). The law further provides a drug is dispensed for a "medically accepted indication" if it is for a use that the FDA has approved. Thus, normally, Medicare can only pay for pharmaceutical prescriptions if the doctor has prescribed the drug for a use that the FDA approved. This makes sense as the FDA comprehensively reviews pharmaceutical manufacturers' detailed applications for new drugs to determine whether the drugs are safe and effective for each intended use. *See* 21 U.S.C. § 355. Congress requires Medicare to only pay for prescription drugs that are safe and effective for their prescribed use.

60.     There is an exception to Medicare's FDA approval requirement. The law also considers it a "medically accepted indication" – and thus permits Medicare to reimburse - if the

13

prescribed use is "supported by citation" in one or more of several specified drug compendia. 42 U.S.C. § 1395x(t)(2)(B) and 42 U.S.C. § 1395w-102(2) (2007) (Medicare); 42 U.S.C. § 1396r- 8(k)(6).

61.     The drug compendia are privately owned, written and published indices of various pharmaceuticals products. For each product, compendia include information about the product's pharmacologic and pharmacokinetic properties (such as adverse effects, and drug interactions) and the FDA-approved indications for that drug. The compendia also, however, includes information about studies of the product in diseases not approved by the FDA and not listed on the label (*i.e.*, "off-label" uses).

62.     Coverage of off-label drug use by Medicaid, TRICARE, other federal and state healthcare programs are similar to Medicare coverage. *See, e.g.,* TRICARE Policy Manual 6010.54-M, Chapter 8, Section 9.1.

63.     Under Medicare and Medicaid, a "claim" is only reimbursable if it is "reasonable and necessary for the diagnosis or treatment of illness or injury or to improve the functioning of a malformed body member". 42 C.F.R. § 402.3.

64.     Federal law requires "any health care practitioner . . . who provides health care services for which payment may be made . . . to assure, to the extent of his authority that services or items ordered or provided by such practitioner . . . be provided economically and only when, and to the extent, medically necessary. 42 U.S.C. §1320c-5(a)(l). The quality of such care must "meet[] professionally recognized standards of health care." 42 U.S.C. §1320c-5(a)(2).

65.     Claims submitted to the Medicare and Medicaid programs for care which do not meet professionally recognized standards of health care are false and fraudulent claims under

the False Claims Act. *See United States ex rel. Aranda v. Community Psychiatric Centers of Oklahoma, Inc.,* 945 F.Supp. 1485, 1488 (W.D. Okla. 1996); *United States v. NEC Healthcare Corp.,* 115 F. Supp.2d 1149, 1156 (W.D. Mo. 2000). "Submitting a claim [under the Medicare or Medicaid programs] under the false pretense of entitlement is fraudulent." *United States ex rel. Kneepkins v. Gambro Healthcare, Inc.;* 115 F.Supp.2d 35, 43 (D. Mass. 2000). "[C]ompliance with federal health care laws . . . is a condition of payment by the Medicare program." *McNutt ex rel. United States v. Haleyville Medical Supplies, Inc.,* 423 F.3d 1256, 1259 (11th Cir. 2005).

66. When such an individual or entity renders a service, it submits a claim for reimbursement that includes the individual or entity's billing number, the identification number for the patient (known as a "HICN"), and a code for the service rendered.

67. Persons and entities may submit claims to Medicare and Medicaid only for services they actually rendered, which must be medically necessary, and they must maintain the medical records showing that they rendered the service and that the service was medically justified.

## PROLEUKIN

68. Proleukin (also known by its chemical name, aldesleukin) was one of the drugs that Prometheus promoted, sold, and distributed due to its contract with NOVARTIS PHARMACEUTICALS CORPORATION ("Novartis"), the maker of the drug.

69. On or about January 1998, the FDA approved Chiron's application for the use of Proleukin for the treatment of treatment of adults with metastatic renal cell carcinoma or metastatic melanoma.

70.     Proleukin is a drug indicated for the treatment of adults with metastatic renal cell carcinoma or metastatic melanoma. The package insert for Proleukin is attached as **Exhibit 1**.

71.     As explained under "Warnings" in the package insert, the drug has severe adverse effects and is particularly dangerous for patients with specified comorbidities and/or complications:

> Because of the severe adverse events which generally accompany Proleukin® (aldesleukin) therapy at the recommended dosages, thorough clinical evaluation should be performed to identify patients with significant cardiac, pulmonary, renal, hepatic, or CNS impairment in whom Proleukin is contraindicated. Patients with normal cardiovascular, pulmonary, hepatic, and CNS function may experience serious, life threatening or fatal adverse events. Adverse events are frequent, often serious, and sometimes fatal.

*Id.* **at 6**.

72.     In fact, of the 255 patients with renal cancer that were given Proleukin as part of the FDA trial, 11 suffered drug-related deaths. *Id.* **at 10.** Of the 270 patients studied with metastatic melanoma, six suffered drug-related deaths. *Id.*

73.     Proleukin is administered only in an inpatient setting. Barring the possibility that the drug has been wrongfully administered in an outpatient setting or somehow dispensed to a patient as a prescription drug, claims for Medicare reimbursement would fall under Medicare Part A and C, but never B nor D.

74.     Proleukin is contraindicated for patients with central nervous system ("CNS") metastases. *Id.* **at 6.** Brain metastases fall within the broader category of central nervous system metastases. Despite this, Prometheus actively marketed the use of this drug directly to community Urologists and Oncologists making claims about its efficacy citing a particular

patient in "the Quinn article", A clinical paper deemed by the company to be a "Promotional Paper", widely distributed with promotional materials, and product brochures in which a patient with brain metastases emerged from Proleukin treatment with Stable Disease. In this instance, not only did Prometheus promote the drug off label for a patient sub-set in which it is not indicated, but also made a false claim about an endpoint (Stable Disease) for which the drug was never studied or approved. Furthermore, Community Urologists "do not" treat patients with Metastatic Renal Cell carcinoma. Patients with Metastatic Kidney Cancer are always referred to an Oncologist. Prometheus, in its illegal marketing and sales tactics are clearly seeking to subvert the efforts of the "expert" Oncologist to gain support from the non-expert urologist so as to interfere with the referral process to funnel patients directly from the community urologist to Prometheus' authorized Proleukin Treatment Centers where the drug may be administered to patients that would otherwise be treated with newer, safer, more efficacious drugs. This is off-label marketing and targeting of physicians who are "non-experts" in metastatic Renal Cancer. Additionally, Prometheus produced and distributed "off-label" usage of Proleukin as outlined in a company "commercially" distributed publication authored by Dr. Quinn in which Proleukin is used in a patient with "brain metastases" in which a non-FDA approved endpoint is established concerning "stable-disease". This is an illegal and unauthorized claim of efficacy and response NOT studied in FDA trials. In FDA trials which led to the approval of Proleukin, only "Complete Response" and "Partial Response" was studied. Not only did Prometheus help finance and author studies like the Quinn article, the company openly trained their sales people to engage in these discussions with clinicians in order to bolster response rates, downplay safety concerns and gain commitment from non-expert physicians to drive sales of Proleukin to

compete with better, more safe and efficacious drugs newly approved to treat metastatic renal cell carcinoma. This is a pattern which is pervasive over a decade long period in which this organization broke the law in order to sell an out-dated, antiquated, toxic and deadly drug.

75.     In the package insert, under the heading "Drug Interactions", the FDA warns that Proleukin may cause adverse reactions when combined with certain psychotropic drugs, nephrotoxic drugs, myelotoxic drugs, cardiotoxic drugs and/or hepatotoxic *Id.* **at 9.**

76.     Proleukin was studied and approved as a monotherapy. Though it is not contraindicated to use this drug in combination with other anticancer medications, combination therapy is an off-label use. *See id.* ("The safety and efficacy of Proleukin in combination with any antineoplastic agents[1] have not been established."). Despite the fact that Proleukin was never approved by the FDA for combination therapy, Prometheus produced clinical papers in conjunction with Treatment Center sites and Key Opinion Leaders in which certain healthy patients were "selected" for therapy, thus bolstering response rates and leading again to erroneous claims and endpoints not approved by the FDA. These papers were widely distributed by the sales team without any oversight from the Medical or Compliance department. In fact, sales reps were routinely engaged in role-play scenarios during corporate sales training and at quarterly meetings to effectively promote and articulate these non-FDA claims so to gain favor with Community Physicians both in Urology and Oncology to drive patient referrals to specific Treatment Centers which were utilizing Proleukin in various investigational, non-FDA approved trials. Please refer to the volume of GRP papers provided as evidence.

---

[1] Commonly referred to as chemotherapy drugs or simply anticancer drugs.

77.    In any given FDA study, only certain endpoints are studied and/or indicated.  For anticancer drugs, studies will commonly reference medical terms of art that relate to specific percentage increases or decreases in the size of the tumor after treatment.  Complete response (CR) means the tumor decreased in size by 100 percent, partial response (PR) means that the tumor decreased in size by at least 50 percent but less than 100 percent, stable disease (SD) means the tumor decreased in size by less than 50 percent but did not increase in size by more than 25 percent, and progressive disease (PD) means that the tumor increased in size by more than 25 percent.  Some other endpoints do not refer specifically to the change in size of the tumor.  For example, progression free survival which is a measure of individuals whose disease did not progress over time. Stable Disease is also an endpoint never studied or mentioned in Prolekin's package insert, yet this was and is a "Response" which Prometheus routinely pointed to in its commercially distributed QUINN article as well as several GRP papers illegally promoted by the sales team in an effort to unlawfully influence Physician referrals.

78.    For Proleukin, the FDA studied the endpoints for complete response and partial response, but not stable disease or progressive disease.  *Id.* at 4–5.  Promoting Proleukin by specifically discussing the endpoint of stable disease is therefore off-label.  It would also be off-label to promote the drug by specifically discussing the endpoint progressive disease.

## PROMETHEUS' OFF-LABEL PROMOTION AND SALES PRACTICES

79.    Defendant Prometheus took over the sale and promotion of Proleukin after the acquisition of Chiron in April 20, 2006.

80.    Defendant Prometheus is a subsidiary of the global nutritional and pharmaceutical company, Nestlé Health Science ("Nestlé Health"), which in turn is a wholly-

19

owned subsidiary of Nestlé a Swiss corporation headquartered in Vevey, Vaud, Switzerland. Prometheus was engaged in the promotion and sale of pharmaceutical drugs intended for human use. Prometheus promoted and distributed its pharmaceutical drugs in Florida and throughout the United States.

81. Though Proleukin was the first drug indicated for treatment of metastatic renal cell carcinoma, it is typical for anticancer drugs to be phased out over time as new drugs are introduced.

82. In 2007, the FDA approved Torisel for treatment of advanced renal cell carcinoma. Torisel can be used on patients with central nervous system metastases (though increased risk is noted) and is without contraindications. **Ex. 2.**

83. In 2009, Votrient was approved for treatment of advanced renal cell carcinoma. *Id.* Unlike Proleukin, Votrient can be administered orally. *Id.*

84. In 2011, the drug Yervoy received approval by the FDA for treatment of advanced renal cell carcinoma and metastatic melanoma. *Id.* Unlike Proleukin, Yervoy was studied for use in combination therapy, was studied for progression free survival, is not contraindicated for patients with brain metastases or other central nervous system metastases, and can be given in an outpatient setting. *Id.* One of the tactics used by Prometheus was to train the sales team to engage in discussions with Physicians highlighting the "Response Rates" achieved in Investigational studies at "selected" hospital sites that had published results which were comparable to the efficacy demonstrated by these newly approved drugs.

85. In 2014, the FDA approved Opdivo, as both a monotherapy and in combination with Yervoy, for treatment of advanced renal cell carcinoma. *Id.* The drug has no

contraindications, though patients with brain metastases were excluded from studies for advanced renal cell carcinoma. *Id.* As a monotherapy, the drug had a response rate (combined CR and PR) of 21.5 percent. *Id.* When combined with Yervoy, the response rate was 41.6 percent. *Id.* In clinical trials, the overall response rate for Proleukin was 15 percent. **Ex. 1.**

86.   Also in 2014, the FDA approved Keytruda for uses including Melanoma. **Ex. 2.**

87.   Keytruda has no contraindications, has a complete response rate of 6%, and has a partial response rate of 27%. *Id.*

88.   Due to pressure and internal demands to grow Proleukin sales in the face of shrinking market-share and relative efficacy, parent company Nestlé Health placed Bram Goorden in the position of general manager at Prometheus for the purposes of renegotiating the contract with Novartis and to aggressively increase sales of cancer drug Proleukin on or about March 2017.

89.   Mr. Goorden set aggressive goals that could only be accomplished by promoting the drug for off-label and medically unnecessary uses. Despite the introduction of newer and safer drugs, Mr. Goorden set a goal to increase annual sales to $68 million in fiscal year 2017 (up from $64 million in 2016), and to further increase annual sales to $100 million over the course of five years. Mr. Goorden has made repeated references to reaching sales figures of "three digits followed by another six digits," or words to that effect (*i.e.* sales greater than $100,000,000.00). In other words, he sought to grow sales of an aging and controversial cancer drug by approximately 47 percent.

90.   As will be discussed herein, in order to respond to market pressures, Prometheus marketed Proleukin for off-label uses and indications to appear more competitive with newly

approved drugs. This included misrepresenting the clinical response rates by discussing the possibility of stable disease as an endpoint as well as non-FDA studies in which researchers achieved better response rates and less adverse reactions by being more selective with patients that received the drug. This also included discussing treatment in patients with brain metastases, for whom the drug was contraindicated.

91.     Prometheus implemented several policies, despite the unlawful nature of such, to increase the sale of Proleukin, including but not limited to:

(a)     Directing Strategic Account Managers ("SAM") to aggressively search the website, www.smartpatients.com[2], ("SMART Patients"), in order to identify, target, and directly contact patients, or their treating physicians, who were receiving immunotherapy for melanoma and kidney cancer;

(b)     Directing SAMs recruit their National Account Manager ("NAM") counterparts to off-set the reimbursement problems Immunotherapy Treatment Centers were facing to maximize reimbursement by aggressively exploiting coding loopholes and often outright fraud via reimbursement regarding the "documentation" of Adverse Events associated with IL-2 (Proleukin), even when patients did not experience reimbursable complications;

(c)     Directing Medical Science Liaisons ("MSL") to search the PROCLAIM database in order to highlight and identify patients who had complete

---

[2] SmartPatients.com is an online community for patients and their families affected by a variety of illnesses.

responses to Proleukin as "cures", categorize non-responders as emerging with stable disease, and to burry morbidity data and data showing dangerously toxic level of the Adverse Events suffered by patients due to their use of Proleukin. The skewed information was then passed to the SAM team to use in sales meetings.

(d)     Directing and encouraging SAMs to distribute non-promotional and non-FDA approved publications;

(e)     Directing SAMs to aggressively market non-FDA availability of Proleukin being used for Investigational Use of IL-2 (Proleukin) in clinical trials, in combination with other drugs and outside the FDA Approved Package Insert dosing protocols;

(f)     Directing and allowing SAMs to freely make unethical claims that Proleukin "cures" cancer;

(g)     Directing and allowing SAMs to unethically work as marketing arms for Immunotherapy Treatment Centers by inducing treating physicians to prescribe Proleukin in the form of providing kickbacks to physicians despite such conflicts of interest;

(h)     Directing Prometheus employees to pose as actual cancer patients on the SMART Patients website and instructing them to make false claims that Proleukin has improved their condition. Some SAMs would create profiles so they could monitor patient dialogue and posts and interact posing as patients.

92.     The original application for Proleukin was only approved by the FDA for use in injection/intravenous bolus[3], and only for treatment of adults with metastatic renal cell carcinoma or metastatic melanoma. **Ex. 1 at 2–5.**

93.     However, Prometheus and its parent companies identified significant market opportunities for Proleukin to be used as an antineoplastic agent and administered at low and intermediate doses, despite the fact that Proleukin never received FDA approval for such use or such doses. In fact, the FDA-approved warning label for Proleukin expressly stated, in relevant part:

> The safety and efficacy of Proleukin in combination with any antineoplastic agents have not been established.
>
> In addition, reduced kidney and liver function secondary to Proleukin treatment may delay elimination of concomitant medications and increase the risk of adverse events from those drugs.
>
> Hypersensitivity reactions have been reported in patients receiving combination regimens containing sequential high dose Proleukin and antineoplastic agents…
>
> Dose modification for toxicity should be accomplished by withholding or interrupting a dose rather than reducing the dose to be given.

**Ex. 1 at 9, 15.**

---

[3] An Intravenous bolus a relatively large dose of medication administered into a vein in a short period, usually within 1 to 30 minutes. The IV bolus is commonly used when rapid administration of a medication is needed, such as in an emergency; when drugs that cannot be diluted, such as many cancer chemotherapeutic drugs, are administered; and when the therapeutic purpose is to achieve a peak drug level in the bloodstream of the patient. The IV bolus is not used when the medication must be diluted in a large-volume parenteral fluid before entering the bloodstream or when the rapid administration of a medication, such as potassium chloride, may be life-threatening. Further, it is not normally used for patients who have decreased cardiac output, decreased urinary output, pulmonary congestion, or systemic edema. Such patients have decreased tolerance to medications, which therefore must be diluted more than usual and administered at slower rates.

94.     During the relevant time period, Defendant Prometheus unlawfully promoted Proleukin for intended uses that were not approved by the FDA. In promoting Proleukin for these off-label uses, Prometheus caused the drug to be misbranded, in violation of 21 U.S.C. § 352(f)(1).

95.     In marketing Proleukin, Prometheus's top management approved marketing and sales plans that identified the off-label opportunities of Proleukin and developed strategies to maximize sales in those areas. Prometheus trained, managed, and rewarded its sales staff for these off-label promotional efforts.

96.     To promote Proleukin, Prometheus provides to the SAMs with a combination of Promotional Clinical Papers and what they referred to as Good Reprint Practices. The Promotional Clinical Papers were pre-approved by Prometheus as "on-label" information that SAMs were encouraged to freely distribute to physicians. Good Reprint Practices are publications that Prometheus identified as including "off-label" information.

97.     Legally, a SAM could not distribute the Good Reprint Practices publication to a physician unless the information was responsive to a physician's question. Even in situations where the SAM is legally authorized to distribute such off-label material, the SAM is not legally allowed to discuss the off-label information with the physician. Instead, the SAM must refer the physician to a medical liaison who is qualified to discuss the off-label uses.

98.     For both the Promotional Clinical Papers and the Good Reprint Practice materials, Prometheus drafted and provided the SAM team with Field Training summaries, which are typically two pages in length. *See* **Ex. 5.** In addition to other items, these summaries provide "Key Points." *Id.* The Field Training summaries for Promotional Clinical Papers

includes a section labeled discussion, but the Field Training summaries for Good Reprint Practice materials does not include a discussion section. *Id.*

99.     Despite the fact that the Field Summaries for Good Reprint Practice publications do not include a discussion sections, SAMs were trained to discuss the key points and encouraged to do so.

100.     As part of his initial training, Prometheus trained Relator and his collogues to understand and explain Good Reprint Practice materials, as evidenced in the training schedule. **Ex. 3 at 1** ("By the end of this workshop the representative will have a better knowledge of the key points of the GRP papers and how and when to apply the papers to support physician discussions. . . . The rep will teach back to the class why they think this point is clinically relevant and how they would distribute it to support a discussion[.]"). Members of the SAM team had no legal reason to discuss Good Reprint Practice materials with a physician.

101.     Though the Promotional Clinical Papers were approved by Prometheus as on-label, some of these articles contained unlawful off-label information. One such article, Revisiting High-Dose IL-2 Therapy: Three Challenging Cases in RCC by Dr. David I. Quinn, discussed a patient with brain metastases who was responsive to Proleukin even though Proleukin is contraindicated for patients with central nervous system metastases. **Ex. 4 Quinn.** That same article discussed stable disease as an endpoint even though the clinical trials did not make any determination about stable disease. *Id.*

102.     Prometheus distributed a Field Training summary for this article, which specifically highlighted both off-label uses as key points and discussion points. **Ex. 5.**

103.    On information and belief, members of the SAM team promoted Proleukin off-label when they unlawfully distributed and discussed the Promotional Clinical Paper by Dr. Quinn containing information about stable disease and the use of Proleukin to treat brain metastases.

104.    SAMs also regularly relied on specific off-label studies to provide inflated response rates. For example, SAMs regularly discussed the article The High-Dose Aldesleukin "Select" Trial: A Trial to Prospectively Validate Predictive Models of Response to Treatment in Patients with Metastatic Renal Cell Carcinoma by David F McDermott, et al. **Ex. 4, Ex. 5.** As is clearly highlighted in the Field Summary, the researchers attempted to select subjects with the express purpose of maximizing positive responses. **Ex. 5.** ("The primary objective of the study was to evaluate prospectively whether the Integrated Selection Model could identify a group of patients with advanced RCC and 'good' predictive features who were significantly more likely to respond to HD IL-2 based therapy than a historical, unselected patient population."). The authors succeeded in finding a population with responses far better than those studied in the FDA trial, with rates as high as 7.5% Complete Response and 25% Partial Response. *Id.* SAMs misleadingly compared these results to the results other drugs obtained in clinical trials, relying on these heavily misleading false equivalencies to make Proleukin appear more competitive.

105.    Relator attended a conference with another member of the SAM team, Joseph Buonpastore. Relator witnessed that Mr. Buonpastore had placed several Good Reprint Practice pamphlets containing what Prometheus determined to be off-label information on his event table and freely passed these materials to any physician who would accept them. Further, for

several such publications, Mr. Buonpastore tore off introductory warnings and disclosures that preceded the article, and turned directly to the title page. Finally, Mr. Buonpastore featured several materials that Defendant had discontinued; for example, Mr. Buonpastore was presenting the likeness of a purportedly disease-free cancer patient while omitting that the patient had since passed away. Relator took a photo of Mr. Buonpastore posing behind the table; the photograph is attached as **Exhibit 6**.

106. While Mr. Buonpastore was away from the table, Relator removed these publications from the event table. When Mr. Buonpastore returned to the event table, he asked Relator why he had taken the publications off the table. When Relator stated they could not freely distribute off-label materials, Mr. Buonpastore replied, "[w]ho is going to care?", or words to that effect.

107. Defendant Prometheus compensated its sales representatives through sales quotas and a bonus structure designed to encourage off-label promotion of Proleukin. In effect, sales representatives generally could only reach their sales goals by promoting and selling off-label.

108. Defendant Prometheus retained medical professionals to speak to doctors about the off-label uses of Proleukin through their Speakers Bureau. However, it was typical for these events to be attended primarily by patients. The company funded promotional programs to promote off-label uses of Proleukin. Off label uses may only be discussed during Continuing Medical Education seminars. One such speaker event at Baton Rouge General Hospital was advertised for an off-label discussion topic and was attended primarily by patients. **Ex. 7**.

109. In addition to traditional sales representatives, Prometheus has paid key Opinion Leaders ; Physicians and nurses experienced in the administration and treatment with Proleukin, and patients who experienced favorable results, to promote Proleukin. Some of these patients promote the drug for off-label purposes and offer illegal and unethical medical advice in patient forums.

110. One such spokeswoman, Peggy Zuckerman, is featured heavily in Defendant' marketing materials. **Ex. 8**; *see also* **Ex. 6**.

111. Ms. Zuckerman gave a cancer patient the following scientific and medical advice:

> HD IL2 was approved in 1992 for RCC, and through a Phase II trial. The data gathered probably understated the value of the treatment. With patients carefully chosen generally in good health, except for the RCC, and with the more typical kinds of kidney cancer, clear cell, papillary the response rate is higher than in the past.
>
> It can lead to Complete Responses [sic [, Partial REsponses, [sic] andStable Disease [sic]. In the case of the latter, the tumor does not shrink, but it doesn't grow. That can let the patient get more surgery or perhaps radiation, as can Partial Response [sic].
>
> Doctors who do not give this treatment often do not understand it, so the fair assessment of whether you are a good candidate should come from an experienced hand.

**Ex. 9** Ms. Zuckerman received a B.A. from the University of North Dakota and her M.S. in Education from the University of Southern California. Ms. Zuckerman lacks a doctorate in medicine or the sciences. In assuring patients that Proleukin is safer and more responsive than the FDA clinical trial results, Ms. Zuckerman is illegally promoting the drug off-label. Her warning that any physician who does not give IL-2 simply does not understand the treatment

is unlawful and borders on unlicensed practice of medicine by a paid spokesperson of a pharmaceutical company.

112.     Defendant Prometheus's off-label promotion of Proleukin raised safety issues, affected the treatment of patients, and undermined the FDA drug approval process. Prometheus undertook this illegal off-label promotion for its own financial gain, despite the potential risk to patients' health and lives.

113.     The promotion of an off-label use for a prescription drug can interfere with the proper treatment of a patient.  Off-label promotion can lull a physician into believing that the drug being promoted is safe and effective for the intended off-label use, and that the FDA has approved the drug for that use.  Thus, off-label promotion can cause a doctor and patient to forgo treatment with an FDA-approved drug that has been proven to be safe and effective, and instead to substitute a treatment urged by the sales representative that is not known to be safe and effective, and that may in fact be harmful.

114.     Prometheus employed a sales strategy that targeted less specialized physicians, specifically urologists, to bypass more knowledgeable oncologists operating in an outpatient setting.  In fact, Defendant specifically trained SAMs to target urologists and explain why, for example, they were marketing a drug for metastatic cancer when urologists do not treat metastatic cancer. *See* **Ex. 3.**

115.     Typically, a urologist treating a patient with renal cell carcinoma will refer the patient to a specialized oncologist in an outpatient setting.  Compared to a urologist, these oncologists are typically more informed about the use of Proleukin and other treatment options for advanced renal cell carcinoma or metastatic melanoma.

116. Inpatient facilities that regularly administer Proleukin have an economic interest to promote the use of Proleukin because competitive drugs may be administered in an outpatient setting whereas Proleukin can only be administered in an inpatient setting.

117. Many oncologists—operating in both inpatient and outpatient settings—are reluctant to recommend treatment with Proleukin given the availability of arguably safer and/or more effective competitive treatments. Advertisements issued by Defendant downplay the safety concerns while instead accusing community care oncologists of not suggesting Proleukin as a treatment option because they are "[c]oncerned about 'losing' a patient to a treatment center". **Ex. 4.**

118. Members of the SAM team would target urologists and recommend that they refer patients directly to specific oncologists who operated in an inpatient setting and who were known by the SAM to treat patients with high-dose IL-2.

119. SAMs would also discuss the off-label publication High dose interleukin-2 (Aldesleukin) – expert consensus on best management practices by Janice P. Dutcher, et al., with targeted urologists. **Ex. 4.** Over time, certain cancer centers, having administered Proleukin for decades, became especially proficient in administering Proleukin and these centers would typically yield fewer fatalities and better response rates. SAMs presented this article detailing best practices to create a false sense that the hospital they would be referring their patients to could would be following these practices. ***See Id.*** In reality, the vast majority of treatment centers are not able to treat patients as proficiently as, for example, Moffitt Cancer Center and this is yet another example of SAMs purposely misleading urologists. It is also

noteworthy that the article discussed other off-label topics including IL-2 treatment for patients with brain metastasis. *Id.*

120. In an email sent September 23, 2015, Mr. Buonpastore specifically identified this scheme of targeting urologists in an effort to bypass middle-men oncologists who were unlikely to refer a patient for treatment with high-dose IL-2 as "Plan A". **Ex. 10.**

121. In this email, Mr. Buonpastore was commending the sales efforts of Jennifer Wyatt. According to the observations of Mr. Buonpastore, Ms. Wyatt spoke with two urologists within her region, each of whom were treating a candidate for high-dose IL-2 treatment. She gave each of these urologists the cell phone number for Dr. Howard Kaufman, an oncologist who is known to treat patients with high-dose IL-2 at Robert Wood Johnson University Hospital. Mr. Buonpastore states that, "[w]hat was of note is that she 'text' [sic] Dr Kaufman later letting him know that he may receive inquires form these Urologists about their patients for possible IL-2 treatment." *Id.* As Mr. Buonpastore explained, "it lets Treaters know that we are out in the [sic] territories trying to increase referrals to their centers, and that by them knowing this, may [sic] be more inclined to consider Proleukin® therapy *first – before any clinical trials*, and secondly we are trying to send them patients their way." *Id.*

122. Ms. Watts had created a tit-for-tat relationship with preferred oncologists in violation of the Federal Anti-Kickback Statute. *See* 42 U.S.C. § 1320a-7b (b). As emphasized by Mr. Buonpastore, Prometheus is making a concerted effort to influence specific oncologists to treat patients with Proleukin, and in exchange, Prometheus provides the physician with free marketing in order to increase their referrals. Moreover, the company trained their sales team to illegally promote Proleukin and to engage in discussions with Urologists highlighting

endpoints and response rates from Non-Promotional, GRP papers. These studies and the results thereof were conducted independently from the FDA approved studies of Proleukin.

123.    Defendant Prometheus instructed providers to miscode DRG codes which caused the hospitals to receive a higher reimbursement from the Government Programs. Hospitals treating patients with high-dose IL-2 may code MS-DRG 837 or MS-DRG 838.

124.    MS-DRG 837 is coded for chemotherapy with acute leukemia as secondary diagnosis or with high dose chemotherapy agent with major complications or co-morbidities.

125.    MS-DRG 838 is coded for chemotherapy with acute leukemia as secondary diagnosis with complications or co-morbidities or with a high dose chemotherapy agent.

126.    SAMs would directly contact hospitals and ask if they were happy with their levels of reimbursement.  Assuming the hospital inquired about increasing reimbursements, SAMs would refer the hospital contact to the NAM team, working in conjunction with the MSL team, who instructed hospitals to code all high-dose IL-2 treatments as MS-DRG 837 based on the fact that it is expected that patients receiving high-dose IL-2 will have major complications during the course of treatment.  *See* **Ex. 11.**  However, the MS-DRG 837 should not be used for the usual complications typically associated with high-dose IL-2 treatment.

127.    Upon instruction from Prometheus, hospitals are encouraged to code all patients receiving high-dose IL-2 as MS-DRG 837, regardless of whether the patient actually experienced major complications or co-morbidities. *See **id.***

128.    Upon instruction from Prometheus, hospitals documented specific complications that would support their miscoded claims, regardless of whether these side effects were actually evident.

33

129. As a result of aggressive their off-label marketing, illegal remunerations, and unlawful advice to miscode, Defendant caused to be made false claims for reimbursement by Federal Healthcare Programs.

130. As a result of their unlawful advice to document complications in support of miscoded diagnosis codes, Defendant caused to be made false records that were provided in support of false claims for reimbursement by Federal Healthcare Programs and/or impacted reimbursements for others requesting reimbursement under Part A.

## FACTUAL ALLEGATIONS ABOUT PLAINTIFF'S UNLAWFUL TERMINATION

131. Relator began working for Prometheus on August 11, 2014, and during his tenure with Prometheus, was promoted to Senior Manager of Sales Training on October 2, 2017. Relator worked in this capacity until January 18, 2018.

132. During his first two months as Senior Manager of Sales Training, Relator worked in the field with the Strategic Account Managers as part of his training. While working with the SAMs, Relator realized that the majority of the SAMs he was working with were engaged in Prometheus's aforementioned sales and promotional practices. For example, Relator observed Prometheus's SAMs engage in the following sales and promotional practices, which include, but are not limited to:

    (a)    Promoting off label, non-FDA approved uses of its cancer drug Proleukin;

    (b)    Unethically promoting Proleukin directly to patients suffering with cancer;

(c)     Distributing promotional publications that it summarily deemed to be non-promotional;

(d)     Making false claims about clinical data and the drug's efficacy in combination with other therapies;

(e)     Making claims that Proleukin "cures" cancer;

(f)     Actively promoting the availability of Proleukin being used at Clinical Trial Sites in combination regimens, citing endpoints and response rates as to encourage referrals to Proleukin Treatment Centers to community physicians;

(g)     Promoting off-label dosing protocols;

(h)     Frequently discussed with other employees several Prometheus employees posing as actual cancer patients on the SMART Patients website and making false claims that Proleukin has improved their condition.

133.    Relator documented the unlawful sales and promotional tactics used by SAMs and as required by company policy, he was going to submit his field report to his supervisor, Tim Thompson.

134.    However, during Relator's first conference since his promotion to Senior Manager of Sales Training, in which Relator personally notified his supervisor, Tim Thompson, of the egregious and unethical promotional and sales practices that Prometheus's SAMs engaged in, he was told not to submit any field report, even though submission of field reports was mandated by Defendant's own corporate policies.

135. Instead, Mr. Thompson instructed Relator that, in the future and despite corporate policy, he should not submit field reports until further notice. Instead, Mr. Thompson directed Relator to only communicate with him by phone about the conduct of Defendant's SAMs he "would take care of it".

136. Relator was concerned about the unlawful sales and promotional practices he observed and the secretive and complicit attitude exhibited by Mr. Thompson regarding such practices. As a result, Relator further communicated his reasonable and good faith concerns to Jenny Alonzo, General Counsel, Chief Compliance Officer, and acting Director of Human Resources and Cherrie Green of Clinical Affairs, on or about December 7, 2017 at Prometheus's California facility.

137. During the meeting, Ms. Alonzo admitted to Relator that Compliance Training was needed and she agreed to collaborate with Relator in order to conduct additional compliance training at the National Sales Meeting in late February. However, Relator was alarmed by Ms. Alonso's cavalier and complicit reaction to Relator's complaint about the unlawful sales and promotional practices by Defendant's SAMs. In fact, during the conference, Ms. Alonso was even able to guess the name of one of the chronic offenders based on Relator's description of his conduct. Some of the violations by this District Manager was Mr. Buonpastore, are discussed above. As Ms. Alonzo laughingly admitted, Mr. Buonpastore had been "chronically" out of compliance for years.

138. Relator also communicated the unlawful practices he observed to Kathleen Heffernan, an Outside Regulatory Consultant via conference call.

139. Relator also caused to be scheduled an hour-long meeting with Prometheus's General Manager Bram Goorden, scheduled for December 8, 2017, in order to discuss his concerns regarding Defendant's unlawful sales and promotional practices, yet Mr. Goorden cancelled the meeting at the last minute.

140. Following his return to Florida and after expressing his concerns to the aforementioned high-ranking members in Prometheus's organization, his supervisor, Tim Thompson, cancelled all calls and ceased responding to Relators emails.

141. In retaliation for Relator's complaints regarding Prometheus's unlawful sales and promotional practices, Prometheus terminated his employment on January 18, 2018.

**COUNT I**
**PRESENTING AND CAUSING TO BE PRESENTED FALSE AND FRAUDULENT CLAIMS IN VIOLATION OF 31 U.S.C. §3729(a)(1)(A)**

142. Relator realleges and readopts the allegations of paragraphs 1 through 141 of this Complaint, as though fully set forth herein.

143. From at least September 2014, through the present, Defendant knowingly presented and caused to be presented false and fraudulent Federal Health Program claims for payment or approval in violation of 31 U.S.C. § 3729(a)(1)(A).

144. By virtue of the false and fraudulent claims made, or caused to be made by the Defendant, the United States suffered damages and therefore is entitled to multiple damages under the False Claims Act, to be determined at trial, plus a civil penalty of $11,181 to $22,363 for each violation.

**WHEREFORE**, Relator respectfully request this Court enter judgment against Defendant and order:

a)      That the United States be awarded damages in the amount of three times the damages sustained by the United States because of the false and fraudulent claims alleged within this Complaint, as the False Claims Act, 31 U.S.C. § 3729 *et seq.* provides;

b)      That civil penalties of $22,363 be imposed for each and every false and fraudulent claim that Defendant presented, or caused to be presented, to the United States;

c)      That pre and post-judgment interest be awarded, along with reasonable attorney's fees, costs and expenses which the Relator necessarily incurred in bringing and pressing this case;

d)      That the Court grant permanent injunctive relief to prevent any recurrence of the False Claims Act violations for which redress is sought in this Complaint;

e)      That the Relator be awarded the maximum amount allowed pursuant to the False Claims Act; and

f)      That this Court award such other and further relief as it deems proper.

**COUNT II**
**CREATING OR CAUSING TO BE CREATED FALSE AND FRAUDULENT RECORDS AND STATEMENTS THAT ARE MATERIAL TO FALSE CLAIMS IN VIOLATION OF 31 U.S.C. § 3729(a)(1)(B)**

145.      Relator realleges and readopts the allegations of paragraphs 1 through 141 of this Complaint, as though fully set forth herein.

146.      From at least September 2014, through the present, Defendant knowingly made, used, or caused to be made or used, false records or statements to get false or fraudulent claims paid or approved by the United States.

147.      By virtue of the false and fraudulent records and statements created or used, or caused to be created or used by Defendant, the United States suffered damages and therefore is

entitled to multiple damages under the False Claims Act, to be determined at trial, plus a civil penalty of $11,181 to $22,363 for each violation.

**WHEREFORE**, Relator respectfully requests this Court enter judgment against Defendant and order:

a) That the United States be awarded damages in the amount of three times the damages sustained by the United States because of the false and fraudulent claims alleged within this Complaint, as the False Claims Act, 31 U.S.C. § 3729 *et seq.* provides;

b) That civil penalties of $22,363 be imposed for each and every false and fraudulent claim that was presented to the United States for which a statement or record made or used, or caused to be made or used by Defendant was material to the false or fraudulent claim;

c) That pre and post-judgment interest be awarded, along with reasonable attorney's fees, costs and expenses which the Relator necessarily incurred in bringing and pressing this case;

d) That the Court grant permanent injunctive relief to prevent any recurrence of the False Claims Act violations for which redress is sought in this Complaint;

e) That the Relator be awarded the maximum amount allowed pursuant to the False Claims Act; and

f) That this Court award such other and further relief as it deems proper.

## COUNT III
## RETALIATION IN VIOLATION OF 31 U.S.C. § 3730(h)

148. Relators reallege and readopt the allegations of paragraphs 1 through 141 of the Complaint, as though fully set forth herein.

149. As described herein, Defendant Prometheus terminated Relator in retaliation for Relator's efforts to prevent one or more violations of 31 U.S.C. § 3721 *et seq.*

150. As a result of the foregoing, Relator has suffered damages because Defendant Prometheus violated 31 U.S.C § 3730(h).

**WHEREFORE**, Relator respectfully request this Court enter judgment against Defendant and order:

a)  That the Relator be awarded damages in the amount of two times the amount of back pay, interest on the back pay, and compensation for any special damages sustained as a result of the termination;

b)  That pre and post-judgment interest be awarded, along with reasonable attorney's fees, costs and expenses which the Relator necessarily incurred in bringing and pressing this case;

c)  That the Court grant permanent injunctive relief to prevent any recurrence of the False Claims Act violations for which redress is sought in this Complaint;

d)  That the Relator be awarded the maximum amount allowed pursuant to the False Claims Act, Relator request that their award be based upon the total value recovered, both tangible and intangible, including any amounts received from individuals or entities who are not parties to this action; and

e)  That this Court award such other and further relief as it deems proper.

**COUNT V**
**CAUSING TO BE PRESENTED FRAUDULENT CLAIMS FOR MEDICAID**
**REIMBURSEMENT IN VIOLATION OF THE STATE FALSE CLAIMS ACT**

151.    Relator realleges and readopts the allegations of paragraphs 1 through 141 of this Complaint, as though fully set forth herein.

152.    From at least September 2014, through the present, Defendant knowingly caused to be presented false claims for Medicaid reimbursement, caused to be created false records to support false claims for Medicaid reimbursement, and/or conspired to violate provisions of the State False Claims Act in violation of Fla. Stat. Ann. § 68.081, *et. seq*.;

153.    By virtue of Defendant unlawful conduct, the State of Florida suffered damages and are therefore entitled to multiple damages under the State False Claims Acts, to be determined at trial, plus a civil penalty as specified by statute.

**WHEREFORE**, Relators respectfully request this Court enter judgment against Defendant and order:

a) the State of Florida, be awarded damages in the amount of three times the damages sustained by the states because of Defendant' unlawful conduct as addressed within this Complaint, as State False Claims Acts provide;

b) That the maximum civil penalties allowed by statute be imposed for each and every violation of the State False Claims Acts;

c) That pre and post-judgment interest be awarded, along with reasonable attorney's fees, costs and expenses which the Relators necessarily incurred in bringing and pressing this case;

d) That the Court grant permanent injunctive relief to prevent any recurrence of the State False Claims Acts violations for which redress is sought in this Complaint;

e) That the Relators be awarded the maximum amount allowed pursuant to the State False Claims Acts; and

f) That this Court award such other and further relief as it deems proper.

## JURY TRIAL DEMAND

Relators demand trial by jury as to all issues so triable.

Dated this 1st day of July, 2019.

Respectfully submitted,

*[signature]*

**LUIS A. CABASSA**
Florida Bar Number: 0053643
**STEVEN G. WENZEL**
Florida Bar Number: 159055
**WENZEL FENTON CABASSA, P.A.**
1110 N. Florida Avenue, Suite 300
Tampa, Florida 33602
Main Number: 813-224-0431
Direct Dial: (813) 379-2565
Facsimile: 813-229-8712
Email: lcabassa@wfclaw.com
Email: swenzel@wfclaw.com
Email: gnichols@wfclaw.com

and

**NATALIE K. KHAWAM, ESQ.**
Florida Bar No. 0027997
**WHISTLEBLOWER LAW FIRM, P.A.**
400 N. Tampa St., Suite 1015
Tampa, Florida 33602
Office: (813) 944-7853
Facsimile: (813) 434-2173
Email: nataliek@813whistle.com

*Attorneys for Relator*

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on this 1st day of August, 2019, a true and correct copy of

the foregoing was hand-delivered to the Clerk for the Middle District of Florida to be filed

under Seal and that a true and correct copy was sent via electronic mail to:

Sean P. Keefe, Esq.                          John C. Richter, Esq.
Assistant United States Attorney             King & Spadling
400 N. Tampa Street, Suite 3200              1700  Pennsylvania Ave., NW, Suite 200
Tampa, FL  33602                             Washington, DC  20006
Sean.keefe@usdoj.gov                         jrichter@kslaw.com

**STEVEN G. WENZEL**