**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF FLORIDA**

UNITED STATES OF AMERICA, et al.,
*ex rel.*  JAMES PEPIO,

      Plaintiff/ Relator

v.                                                                    Case No.: 8:18-cv-02931-VMC-AAS

PROMETHEUS LABORATORIES, INC.,

      Defendant.
_____/

## SECOND AMENDED COMPLAINT

Relator/Plaintiff JAMES PEPIO (hereinafter "Relator"), by and through undersigned counsel, brings this False Claims Act Complaint, on behalf of the UNITED STATES OF AMERICA (hereinafter "United States"), against the Defendant, PROMETHEUS LABORATORIES, INC.

I.   JURISDICTION AND VENUE ............................................................................................... 1

II.  PROCEDURAL HISTORY ................................................................................................... 1

III. THE PARTIES ...................................................................................................................... 2

    A.  Plaintiff/Relator James Pepio .................................................................................. 2
    B.  Defendant Prometheus Laboratories, Inc. ............................................................... 2

IV.  APPLICABLE LAW ............................................................................................................ 3

    A.  The Federal False Claims Act .................................................................................. 3
    B.  The State False Claims Act ...................................................................................... 4
    C.  The Federal Anti-Kickback Statute ......................................................................... 5

V.   BACKGROUND ON HEALTH PROGRAMS ................................................................... 6

    A.  Medicare Program Background and Requirements .................................................. 6
    B.  Medicaid Program .................................................................................................... 6
    C.  Tricare/Champus ...................................................................................................... 7
    D.  Federal Employee Health Benefits Program ........................................................... 8

VI.  FACTUAL BACKGROUND ............................................................................................... 9

    A.  Off-Label Marketing ................................................................................................ 9
    B.  CMS Guidance on Off-Label Marketing ............................................................... 11
    C.  Coverage of Off-Label Drugs ................................................................................ 12
    D.  History of Proleukin ............................................................................................... 13

VII. FRAUD ALLEGATIONS BY RELATOR ....................................................................... 17

    A.  Off-Label Marketing .............................................................................................. 17
    B.  False / Illegal Marketing ........................................................................................ 27
    C.  Conspiracy to Miscode .......................................................................................... 29
    D.  Kickbacks ............................................................................................................... 30
    E.  Retaliation .............................................................................................................. 32

VIII. CLAIMS .............................................................................................................................. 34

    A.  Submission of False Claims ................................................................................... 34
    B.  Scienter .................................................................................................................. 36
    C.  Materiality .............................................................................................................. 37

CAUSES OF ACTION ................................................................................................................ 37

    (False Claims Act: Presentation of False Claims) (31 U.S.C. § 3729 (a)(1)(A)) ............................ 37
    (False Claims Act: Making and Using False Records and Statements to Get False Claims Paid) (31
    U.S.C. § 3729(a)(1)(B)) ........................................................................................................... 38
    (False Claims Act: Retaliation) (31 U.S.C. § 3730(h)) ............................................................... 39
    (State False Claims Act) ............................................................................................................ 40

PRAYER FOR RELIEF .............................................................................................................. 40

## I.      JURISDICTION AND VENUE

1.     This action arises under the laws of the United States of America to redress violations of the federal False Claims Act, 31 U.S.C. § 3729, et seq.

2.     This Court has subject-matter jurisdiction over this action pursuant to 31 U.S.C. § 3732(a) and 28 U.S.C. §§ 1331, 1345.

3.     Venue is proper in the Middle District of Florida pursuant to 31 U.S.C. §3732(a) and 28 U.S.C. §1391 as all material events giving rise to these claims occurred in this district.

## II.      PROCEDURAL HISTORY

4.     Relator filed the original Complaint under seal on or about December 3, 2018. *See* Docket No. 1.

5.     The Amended Complaint was filed under seal on or about August 1, 2019. *See* Docket No. 7.

6.     The case was ordered unsealed on April 1, 2020. *See* Docket No. 18.

7.     Undersigned counsel first appeared as counsel for the Relator in this matter on April 27, 2020, and prior counsel withdrew from representing Relator on May 18, 2020.

8.     Defendant waived service of the Amended Complaint on May 29, 2020. *See* Docket No. 26.

9.     Defendant filed a Motion to Dismiss the Amended Complaint on July 13, 2020. *See* Docket No. 34.

10.     On August 3, 3030, Relator filed a response to the motion to dismiss. *See* Docket No. 40.

11. On August 28, 2020, before the Court ruled on the Motion to Dismiss, Relator filed a Motion for Leave to File a Second Amended Complaint.

12. This Second Amended Complaint is being filed pursuant to the Court's Order granting Relator leave to file an amended pleading.

### III.  THE PARTIES

**A.  Plaintiff/Relator James Pepio**

13. Plaintiff/ Relator James Pepio is a resident of Hillsborough County, Florida and a citizen of the United States.

14. Relator was employed by Defendant from 2014 until his termination on January 18, 2018.

**B.  Defendant Prometheus Laboratories, Inc.**

15. Defendant Prometheus Laboratories, Inc. is a foreign corporation organized under the laws of California.

16. Prometheus is a subsidiary of the global nutritional and pharmaceutical company Nestle Health Science, which is a wholly-owned subsidiary of Nestle, a swiss corporation headquartered in Switzerland.

17. Prometheus engages in the promotion and sale of pharmaceutical drugs intended for use in humans.

18. Prometheus has substantial operations throughout the state of Florida and the United States.

19. Prometheus promoted and distributed pharmaceutical drugs in Florida and throughout the United States.

## IV.    APPLICABLE LAW

### A.    The Federal False Claims Act

20.   The federal False Claims Act provides that any person who (1) knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval; (2) knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim; (3) conspires to commit a violation of (1) or (2) is liable to the United States Government for a civil penalty of not less than $5,500 and not more than $11,000, plus three times the amount of damages which the Government sustains because of the act of that person. 31 U.S.C. §3729(a)(1)(A), (B) and (C).

21.   The terms "knowing" and "knowingly" under this section mean that a person, with respect to information (1) has actual knowledge of the information; (2) acts in deliberate ignorance of the truth or falsity of the information; or (3) acts in reckless disregard of the truth or falsity of the information. No proof of specific intent to defraud is required. 31 U.S.C. §3729(b)(1).

22.    The term "claim" means "any request or demand, whether under a contract or otherwise, for money or property and whether or not the United States has title to the money or property, that (1) is presented to an officer, employee, or agent of the United States; or (2) is made to a contractor, grantee, or other recipient, if the money or property is to be spent or used on the Governments behalf or to advance a Government program or interest, and if the United States Government (a) provides or has provided any portion of the money or property requested or demanded; or (b) will reimburse such contractor, grantee, or other

recipient for any portion of the money or property which is requested or demanded . . . ." 31 U.S.C. § 3729(b)(2)(A)(i)-(ii).

23.    "[T]he term 'material' means having a natural tendency to influence, or be capable of influencing, the payment or receipt of money or property."  31 U.S.C. § 3729(b)(4).

24.    Further, "[a]ny employee . . . shall be entitled to all relief necessary to make that employee . . . whole, if that employee . . . is discharged, demoted, suspended, threatened, harassed, or in any other manner discriminated against in the terms and conditions of employment because of lawful acts done by the employee . . . or associated others in furtherance of an action under [31 U.S.C. § 3730] or other efforts to stop 1 or more violations of this [False Claims Act]."  31 U.S.C. § 3730(h)(1).

25.    "Relief [for unlawful retaliation] . . . shall include reinstatement with the same seniority status that employee, contractor, or agent would have had but for the discrimination, 2 times the amount of back pay, interest on the back pay, and compensation for any special damages sustained as a result of the discrimination, including litigation costs and reasonable attorneys' fees."  Id. at § 3730(h)(2).

### B.    The State False Claims Act

26.    In response to federal incentives, most states have adopted laws that closely mirror the federal false claims act for moneys that have been defrauded.

27.    The State of Florida has adopted a state false claims act under which a qui tam relator may bring an action on behalf of the state to recover treble damages for Medicaid fraud in addition to statutory penalties. Fla. Stat. Ann. § 68.081, et seq.

C.    **The Federal Anti-Kickback Statute**

28.   The federal Anti-Kickback statute was enacted in 1972 to protect patients and federal health care programs from fraud and abuse by controlling the influence of money on health care decisions.

29.   The federal Anti-Kickback Statute and analogous state laws make it a crime to knowingly and willfully offer, pay, solicit, or receive any remuneration to induce a person (1) to refer an individual to a person for the furnishing of any item or service covered under a federal health care program; or (2) to purchase, lease, order, arrange for or recommend any good, facility, service, or item covered under a federal health care program. 42 U.S.C. § 1320a-7b(b)(1) and (2).

30.   The term "any remuneration means any kickback, bribe, or rebate, direct or indirect, over or covert, in cash or in kind. 42 U.S.C. § 1320a-7b(b)(1).

31.   A violation of the federal Anti-Kickback Statute constitutes a felony punishable by a maximum fine of $25,000, five years imprisonment, or both. Any party convicted under the statute must be excluded from Federal health care programs for a term of at least five years. 42 U.S.C. §1320a-7(a)(1).

32.   Accordingly, manufacturers of products paid for in whole or in part by federal healthcare programs may not offer or pay any renumeration, in case or in kind, directly or indirectly, to induce physicians or hospitals or others to order or recommend products paid for in whole or in part by federally-funded healthcare programs such as Medicare and Medicaid.

## V.      BACKGROUND ON HEALTH PROGRAMS

### A.      Medicare Program Background and Requirements

33.   In 1965, Congress enacted Title XVIII of the Social Security Act, which established the Medicare program to provide health insurance for the elderly and disabled. 42 U.S.C. §§1395 et seq.  Medicare is a health insurance program for: people aged 65 or older; people under the age of 65 with certain disabilities; and people of all ages with end-stage renal disease.

34.   The Medicare Program is a federally funded and operated program.  Medicare is administered by the United States Department of Health and Human Services (HHS) through the Centers for Medicare and Medicaid Services (CMS), a department of HHS. Much of the daily administration and operation of the Medicare Program is managed through private insurers under contract with the federal government.

35.   Medicare has four primary parts: Part A- hospital insurance; Part B- medical insurance; Part C- Medicare advantage managed care; and Part D- prescription drugs.

### B.      Medicaid Program

36.   Medicaid was created in 1965 to aid states in furnishing medical assistance to eligible persons.  Medicaid is a joint federal and state assistance program. Each state administers its own Medicaid program.  Funding for Medicaid is shared between the federal government and the state governments that choose to participate in the program.

37.   Federal support for Medicaid is significant. Each state's federal funding is determined by its Federal Medical Assistance Percentage (FMAP), which is set annually and is based on per capita income compared to the national average.

38.  Similar to Medicare, a claim under the Medicaid program is reimbursable only when it is reasonable and necessary for the diagnosis or treatment of illness or injury or to improve the functioning of a malformed body member.  42 C.F.R. §402.3.

**C.    Tricare/Champus**

39.  In 1967, the Department of Defense created the Civilian Health and Medical Program of the Uniformed Services ("CHAMPUS"), which is a federally funded medical program created by Congress. 10 U.S.C . §1071.

40.  CHAMPUS beneficiaries include active military personnel, retired personnel, and dependents of both active and retired personnel.

41.  In 1995, the Department of Defense established TRICARE, a managed healthcare program, which operates as a supplement to CHAMPUS. See 32 C.F.R. §§199.4, 199.17(a).

42.  The TRICARE Management Activity ("TMA") oversees this program. Since the establishment of TRICARE in 1995, both programs are frequently referred to collectively as TRICARE/CHAMPUS , or just TRICARE.

43.  The TRICARE managed healthcare programs are created through contracts with managed care contractors in three geographic regions: North, South,  and  West.

44.  TRICARE health services are provided through both network , and non-network, participating providers.

45.  Providers who are Medicare-certified providers are also considered TRICARE-authorized providers. TRICARE-authorized providers are either Network Providers, or Non-Network Providers.

46.   Network Providers include hospitals, other authorized medical facilities, doctors and healthcare professionals, all of whom enter into an agreement with the region's managed care contractor, and provide services for an agreed reimbursement rate. 32 C.F.R. § 1 99.14 (a).

47.   Non-Network Participating Providers include hospitals, other authorized medical facilities, doctors and healthcare professionals who do not enter an agreement with the region's managed care provider and are reimbursed at rates established by TRICARE regulations. Id.

48.   Just as with Medicare and Medicaid, TRICARE providers have an obligation to provide services and supplies at only the appropriate level and "only when and to the extent medically necessary." 32 C.F.R. § 199.6(a)(5).

> **D.**   **Federal Employee Health Benefits Program**

49.   The Federal Employee Health Benefits Program ("FEHBP") is a federally funded medical insurance program for federal employees, retirees, their spouses, and unmarried dependent children under age 22, administered by the Office of Personnel Management ("OPM") pursuant to 5 U.S.C. §§ 8901, et seq.

50.   Through the OPM, the Government contracts with private health plans or carriers to deliver health benefits to its employees.

51.   Monies for the FEHBP are maintained in the Employees' Health Benefits Fund and are administered by OPM. 5 U.S.C. §8908.

52.   Federal agencies and their employees contribute to the Fund to cover the total cost of healthcare premiums. 5. U.S.C. 8906.

53.   The monies from the Fund are used to reimburse the carriers for claims they pay on behalf of FEHBP beneficiaries.

54.   Like Medicare, Medicaid, and TRICARE, FEHBP will not cover any treatment or surgery that is not medically necessary. 5 U.S.C. 8902(n)(1)(A).

## VI.   FACTUAL BACKGROUND

### A.   Off-Label Marketing

55.   The Food, Drug and Cosmetic Act ("FDCA") forbids pharmaceutical manufacturers from marketing or selling a drug until the Food and Drug Administration ("FDA") has approved it as safe and effective for its intended use or uses (the drug's "indications"). *See* 21 U.S.C. §§ 355(a), (d).

56.   An *unapproved* use of an FDA-approved drug is referred to as "off-label."

57.   Off-label uses can include the use of a drug for a disease or condition that the drug was not approved to treat, or administration of the drug in a different way or form from what was approved, or even an unapproved dosage of the drug.

58.   Off-label marketing refers to the marketing of an FDA-approved drug for uses that have not undergone FDA scrutiny and approval.

59.   The FDA regulates drugs based on the "intended uses" for such products.

60.   Before marketing and selling a prescription drug, a manufacturer must demonstrate to the FDA that the product is safe and effective for each intended use.  21 U.S.C. § 331(d); 21 U.S.C. § 355(a) 360b(a).

61.   The FDA reviews pharmaceutical manufacturers' applications for new drugs to determine whether the drugs are safe and effective for each intended use.  *See* 21 U.S.C. § 355.

62.   The approved uses of a drug are summarized in what is commonly referred to as the "package insert."  The package insert will also contain information on warnings and contraindications.

63.   Although the FDA is responsible for ensuring that a drug is safe and effective for the specific approved indication, the FDA does not regulate the practice of medicine.

64.   Once a drug is approved for a particular use, doctors may legally prescribe the drug for any "non-indicated" or "off-label" purpose. The FDA does not prohibit physicians from prescribing the drug for uses that are different than those approved by the FDA.

65.   When considering off-label prescribing, doctors rely on recommendations from colleagues and academics, education seminars and clinical trials evidence.

66.   Much of what the doctor relies on is information (or, as in this case, misinformation) provided by sales representatives from drug makers, drug-company sponsored events and speaker programs, and drug-company sponsored clinical trials.

67.   The FDA strictly regulates the content of direct-to-physician product promotion and drug labeling information used by pharmaceutical companies to market and sell FDA-approved drugs pursuant to the FDCA.

68.   But with very few exceptions, the FDA prohibits drug manufacturers from marketing or promoting drugs for uses/indications not explicitly approved by the FDA.

69.   The FDA prohibits dissemination of materials that are false and misleading, such as those that only present favorable information when unfavorable publications exist, exclude mandatory information about the safety and efficacy of the drug use, or present conclusions that clearly cannot be supported by the results of the study. 21 C.F.R. §99.101.

70.   Off-label information may be disseminated only in response to an unsolicited request from a health care practitioner.

71.   In any other circumstance, a manufacturer may disseminate information concerning off-label use only after it has submitted an application to the FDA seeking approval of the drug for that off-label use.

72.   Strong policy reasons exist for strict regulation of off-label marketing: off-label promotion bypasses the FDA's strict review and approval process, and it also removes the incentive to obtain definitive clinical study data showing the efficacy and safety of a product and accordingly, the medical necessity for its use.

73.   In sum, the regulatory regime protects patients and consumers by ensuring that drug companies do not promote drugs for uses other than those found to be safe and effective by an independent, scientific government body- the FDA.

**B.    CMS Guidance on Off-Label Marketing**

74.   In October 2015, the Centers for Medicare & Medicaid Services (CMS) published a report titled "Off-Label Pharmaceutical Marketing: How to Recognize and Report It."

75.   According to CMS, unlawful off-label promotion includes the following:

- Paying incentives to sales representatives based on sales for off-label use;

- Paying kickbacks to physicians to prescribe drugs for off-label use;

- Disseminating misleading posters promoting off-label use;

- Paying physicians:

  o To pretend to be the authors of articles about off-label uses when the articles were actually written by manufacturers' agents;
  o To serve as members of "advisory boards" promoting off-label use;
  o To travel to resort locations to listen to promotions about off-label use; or
  o  To give promotional lectures in favor of off-label use to fellow practitioners;

- Providing advice to prescribers on how to code their claims and document their medical records to support payment for off-label uses not covered by Medicaid;

- Publicizing studies showing efficacy of off-label uses while suppressing studies showing no efficacy; and

- Making false representations directly to Medicaid to influence decisions about payment for drugs used off-label.

### C.   <u>Coverage of Off-Label Drugs</u>

76.  Federal reimbursement for prescription drugs under Medicaid is generally limited to drugs dispensed for a medically accepted indication. *See, e.g.,* 42 U.S.C. §1395.

77.  A drug is considered to be dispensed for a medically accepted indication if it is dispensed for a use that the FDA has approved.

78.  It is also considered a medically accepted indication if the prescribed use is supported by citation in one or more of several specific drug compendia. 42 U.S.C. § l396r-8(k)(6).

79.  For each product, compendia include information about the product's pharmacologic and pharmacokinetic properties (such as adverse effects and drug interactions) and the FDA-approved indications for that drug.

80.   The compendia also include information about studies of the product in diseases not approved by the FDA and not listed on the label (i.e., off-label uses).

81.   Whether a drug is FDA approved for a particular indication, and whether that indication is recommended in one or more of the statutorily named drug Compendia determines whether a prescription for that use may be reimbursed under Medicaid and other federal health care programs.

82.   Therefore, a claim for reimbursement for an off-label, non-compendium prescription constitutes a false claim when presented to the government.

83.   Coverage of off-label drug use by Medicare, TRICARE, other federal and state healthcare programs are similar to Medicaid coverage. *See. e.g.,* TRICARE Policy Manual 6010.54-M, Chapter 8, Section 9.1.

84.   The three statutorily named Compendia identified in the Medicaid statute include the American Hospital Formulary Service Drug Information, the United States Pharmacopeia-Drug Information, and the DRUGDEX Information System.

85.   During the time period relevant to this Complaint, Prometheus caused the submission of claims for off-label uses that were ineligible for reimbursement by Medicaid, Medicare, and other federal healthcare programs because the uses were neither FDA-approved nor supported by the applicable Compendia.

### D.   <u>History of Proleukin</u>

86.   In January 1998, the FDA approved Proleukin (aldesleukin) for the treatment of adults with metastatic renal cell carcinoma or metastatic melanoma.

87.   Proleukin is administered in an inpatient setting only.

13

88.   Unless the drug was wrongfully administered in an outpatient setting or wrongfully dispensed to a patient as a prescription drug, claims for Medicare reimbursement of Proleukin would fall under Medicare Part A and C, but never B nor D.

89.   Proleukin is indicated for the treatment of adults with metastatic renal cell carcinoma or metastatic melanoma. The package insert for Proleukin is attached hereto as Exhibit 1.

90.   The package insert indicates that Proleukin has severe adverse effects and is particularly dangerous for patients with specific comorbidities and/or complications:

> Because of the severe adverse events which generally accompany Proleukin® (aldesleukin) therapy at the recommended dosages, thorough clinical evaluation should be performed to identify patients with significant cardiac, pulmonary, renal, hepatic, or CNS impairment in whom Proleukin is contraindicated. Patients with normal cardiovascular, pulmonary, hepatic, and CNS function may experience serious, life threatening or fatal adverse events. Adverse events are frequent, often serious and sometimes fatal.

Exhibit 1 at 6.

91.   Of the 225 patients with renal cancer that were given Proleukin as part of the FDA trial, 11 suffered drug-related deaths. Exhibit 1 at 10.

92.   Of the 270 patients that were studied with metastatic melanoma, six suffered drug-related deaths. Exhibit 1 at 10.

93.   Proleukin is contraindicated for patients with central nervous system (CNS) metastases, which include brain metastases. Exhibit 1 at 6.

94.   The package insert for Proleukin also warns that Proleukin may cause adverse reactions when combined with certain psychotropic drugs, nephrotoxic drugs, myelotoxic

drugs, cardiotoxic drugs and /or hepatoxic drugs. Exhibit 1 at 9.

95.   Proleukin was studied and approved as a monotherapy.

96.   While it is not contraindicated to use Proleukin in combination with other anticancer medications, combination therapy is an off-label use. *See* Exhibit 1 at 9 ("The safety and efficacy of Proleukin in combination with any antineoplastic agents have not been established.").

97.   In FDA studies, only certain endpoints are studied and/or indicated.

98.   For anticancer drugs, FDA studies will commonly reference medical terms that relate to specific percentage increases or decreases in the size of a tumor after treatment.

99.   Complete response (CR) means that the tumor decreased in size by 100%.

100.   Partial response (PR) means that the tumor decreased in size by at least 50% but less than 100%.

101.   Stable disease (SD) means that the tumor decreased in size by less than 50% but did not increase in size by more than 25%.

102.   Progressive disease (PD) means that the tumor increased in size by more than 25%.

103.   For Proleukin, the FDA studied only the endpoints for complete response and partial response. The FDA did not study stable disease or progressive disease for Proleukin. Exhibit 1 at 4-5.

104.   Defendant Prometheus took over the sale and promotion of Proleukin in April 2006.

105.   Prometheus promoted, sold, and distributed Proleukin under its contract with the drug maker Novartis Pharmaceutical Corporation.

106. Proleukin was the first drug indicated for treatment of metastatic renal cell carcinoma, but over time newer drugs were introduced.

107. It is typical for anticancer drugs to be phased out over time as new drugs are introduced.

108. In 2007, the FDA approved the drug Torisel for the treatment of advanced renal cell carcinoma. *See* Exhibit 2 at 2-22.

109. Torisel can be used on patients with central nervous system metastases (though increased risk is noted) and is without contraindications.

110. In 2009, the drug Votrient was approved for treatment of advanced renal cell carcinoma. *See* Exhibit 2 at 39-56.

111. Unlike Proleukin, Votrient can be administered orally.

112. In 2011, the drug Yervoy was approved by the FDA for the treatment of advanced renal cell carcinoma and metastatic melanoma. *See* Exhibit 2 at 23-38.

113. Unlike Proleukin, Yervoy was studied for use in combination therapy and progression free survival, is not contraindicated for patients with brain metastases or other central nervous system metastases, and can be given in an outpatient setting.

114. In 2014, the drug Opdivo was approved by the FDA as both a monotherapy and in combination with Yervoy for the treatment of advanced renal cell carcinoma. *See* Exhibit 2 at 57-88.

115. As a monotherapy, Opdivo had a response rate of 21.5%.

116. When combined with Yervoy, Opdivo had a response rate of 41.6%.

117. In comparison, Proleukin had a response rate of 15%.

118.  Also, in 2014, the drug Keytruda was approved by the FDA for the treatment of melanoma. *See* Exhibit 2 at 89-140.

119.  Keytruda had no contraindications.

120.  Due to market pressures and internal demands to grow Proleukin sales in the face of shrinking market-share and relative efficacy, on or about March 2017, parent company Nestle Health placed Bram Goorden in the position of general manager at Prometheus for purposes of renegotiating the contract with Novartis and aggressively increasing sales of Proleukin.

121.  Mr. Goorden set aggressive goals that could only be accomplished by promoting the drug for off-label and medically unnecessary uses.

122.   Despite the introduction of newer and safer drugs as outlined above, Mr. Goorden set a company goal to increase annual Proleukin sales to $68 million in fiscal year 2017 (up from $64 million in 2016), and to further increase annual sales to $100 million over the course of five years.

123.  Based on these goals, Mr. Goorden sought to grow Proleukin sales by approximately 47%.

### VII.    **FRAUD ALLEGATIONS BY RELATOR**

#### A.    **Off-Label Marketing**

124.  As discussed above, the FDA strictly regulates the content of direct-to-physician product promotion and drug labeling information used by pharmaceutical companies to market and sell FDA-approved drugs pursuant to the FDCA.

125.  Under the FDCA, qualified medical professionals may provide purely scientific medical information for uses other than those approved by the FDA, but all other presentations, promotions, and marketing to physicians for uses other than those approved by the FDA are considered off-label marketing or "misbranding" proscribed by the FDCA. See 21 U.S.C. §§ 33l(a)-(b), 352(a), (f).

126.  Pharmaceutical promotional and marketing materials and presentations lacking in fair balance or that are otherwise false or misleading "misbrand" a drug in violation of the FDCA.

127.  Labels– including brochures, booklets, detailing pieces, literature, medical reprints, sound recording, exhibits, and audio-visual material– are "misbranded" if they include misleading statements or if they omit material facts. 21 U.S.C. §§202.1(1)(2), 321(n).

128.  During the relevant time period, Defendant Prometheus unlawfully promoted Proleukin for intended uses that were not approved by the FDA.

129.  In promoting Proleukin for these off-label uses, Prometheus caused the drug to be misbranded, in violation of 21 U. S. C. § 352(f).

130.  Prometheus approved marketing and sales plans that identified the off-label opportunities of Proleukin and developed strategies to maximize sales in those areas.

131.  The off-label promotion scheme was designed to intentionally mislead prescribers, end users, and patients into thinking Proleukin was comparable to newer, better drugs when Defendant knew that it was not.

132.  Promotion for off-label uses of Proleukin was facilitated by Prometheus and accomplished through carious tactics and techniques, including but not limited to: (1)

directing employees to distribute and emphasize non-promotional and non-FDA approved publications; (2) directing sales employees to emphasize off-label information such as misleading response rates, information pertaining to combination therapy despite the fact Proleukin was only approved for monotherapy uses, and information pertaining to off-label dosing, despite the fact Proleukin was never approved by the FDA for such use or such doses; (3) funding promotional programs and paying spokespeople to promote off-label uses of Proleukin; and (4) targeting physicians who are considered non-experts in renal cancer.

133.   Prometheus compensated sales representatives through sales quotas and a bonus structure designed to encourage off-label promotion.

134.   To promote Proleukin, Prometheus provided Strategic Account Managers (SAMs) with a combination of Promotional Clinical Papers and what they referred to as Good Reprint Practices.

135.   Promotional Clinical Papers were pre-approved by Prometheus as containing "on-label" information that SAMs were encouraged to freely distribute to physicians.

136.   Good Reprint Practices are publications that Prometheus identified as including "off-label" information.

137.   Legally, a SAM could not distribute the Good Reprint Practices publication to a physician unless the information was responsive to a physician's question.

138.   Even in situations where the SAM is legally authorized to distribute such off-label material, the SAM is not legally allowed to discuss the off-label information with the

physician.  Instead, the SAM must refer the physician to a medical liaison who is qualified to discuss the off-label uses.

139.  Prometheus drafted and provided SAMs with Field Training Summaries which included "key points" that employees were trained on and expected to be able to explain during sales situations.  Field Training Summaries regarding relevant documents is attached hereto as Exhibit 5.

140.  Prometheus trained Relator and his colleagues to understand and explain Good Reprint Practice materials (GRP) as is evidenced by Prometheus training materials. *See* Exhibit 3 at 14 ("by the end of this workshop the representative will have a better knowledge of the key points of the GRP papers and how and when to apply the papers to support physician discussions. . . The rep will teach back to the class why they think this point is clinically relevant and how they would distribute it to support a discussion").

141.  However, SAMs had no legal reason to discuss GRP materials with physicians. As discussed above, the SAM is not legally allowed to discuss the off-label information with the physician. Instead, the SAM must refer the physician to a medical liaison who is qualified to discuss the off-label uses.

142.  Prometheus encouraged SAMs to promote Proleukin off-label by using articles containing off-label information.

143.  Prometheus would frequently approve papers as on-label even though they contained off-label information.

144.  In many instances, Prometheus even financed the articles they would later use to fraudulently market Proleukin for off-label uses.

145.  One such article, *Revisiting High-Dose IL-2 Therapy: Three Challenging Cases in RCC* by Dr. David J. Quinn ("Quinn article) discussed a patient with brain metastases who was responsive to Proleukin even though Proleukin is contraindicated for patients with central nervous system metastases. Exhibit 4 at 89-94.

146.  The Quinn article also discussed stable disease as an endpoint even though the clinical trials did not make any determination about stable disease. Exhibit 4 at 89-94.

147.  Prometheus distributed a Field Training Summary to employees for the Quinn article, which specifically highlights both off-label uses as key points and discussion points. Exhibit 5 at 10-11.

148.  The Field Training Summary for the Quinn article emphasizes the patient with brain metastases and stable disease endpoint. Exhibit 5 at 10-11.

149.  Not only did Prometheus help finance the Quinn article, but they also openly trained employees to engage in discussions with clinicians about the Quinn article.

150.  On information and belief, Prometheus employees promoted Proleukin off-label when they unlawfully distributed the discussed the Quinn article which contained information about stable disease and the use of Proleukin to treat brain metastases.

151.  SAMs also regularly relied on specific off-label studies to provide inflated response rates when promoting Proleukin.

152.  One such article, *The High-Dose Aldesleukin "Select" Trial: A Trial to Prospectively Validate Predictive Models of Response to Treatment in Patients with Metastatic Renal Cell Carcinoma* by David D. McDermott, et al. (McDermott Article) was regularly used by SAMs in the off-label promotion of Proleukin. Exhibit 4 at 80-88.

153.  The primary objective of the McDermott study was to prospectively determine whether the response rate to high-dose IL2 for patients with metastatic renal cell carcinoma and "good" pathologic predictive features by the integrated selection model was significantly higher than the historical ORR in an unselected patient population. Exhibit 4 at 83.

154.  The researchers in the McDermott study selected subjects who were significantly more likely to respond to the drug, with the express purpose of maximizing positive responses.

155.  High-dose Aldesleukin has a historical objective response rate of 14%. Exhibit 4 at 81.

156.  The McDermott study, however, revealed an objective response rate of 25%, substantially greater than the initial historical response rate in patients with metastatic renal cell carcinoma. Exhibit 4 at 84-85.

157.  Prometheus distributed a Field Training Summary to employees for the McDermott article, which specifically highlights the response rates of the McDermott article. Exhibit 5 at 6-7.

158.  SAMs misleadingly compared the response rates from the McDermott study to the response rates of other drugs obtained in clinical trials in order to make Proleukin appear more competitive than newer drugs.

159.  Prometheus trained and encouraged employees to openly distribute off-label materials.

160.  In one instance, at a conference, Relator witnessed Joseph Buonpastore, a SAM at Prometheus, place several GRP pamphlets containing off-label information  on  his  event table and freely pass these materials to any physician who would accept them. A photo of Mr. Buonpastore posing at his event table is attached hereto as Exhibit 6.

161.  For several of these publications, Mr. Buonpastore tore off introductory warnings and disclosures that preceded the article and turned directly to the title page.

162. When Relator explained to Mr. Buonpastore that they were prohibited from distributing off-label materials, Mr. Buonpastore responded "who is going to care?" or words to that effect.

163.  In addition to sales employees, Prometheus paid key opinion leaders, physicians and other medical professionals experienced in the administration and treatment of Proleukin and patients who experienced favorable results to promote Proleukin.

164.  In many instances, these spokespeople would promote the drug for off-label uses.

165.  One such spokesperson, Peggy Zuckerman, is featured heavily in Prometheus marketing materials. *See* Exhibits 8 and 9.

166.  Ms. Zuckerman has a Master's Degree in Education.

167.  Ms. Zuckerman does not hold any degree in medicine or any related medical field.

168.   However, as a paid spokesperson for Prometheus, Ms. Zuckerman assured patients that Prokleukin was safer and more responsive than the FDA clinical trial results:

> HD IL2 was approved in 1992 for RCC , and through a Phase II trial. The data gathered probably understated the value of the treatment. With patients carefully chosen generally in good health, except for the RCC, and with the more typical kinds of kidney cancer, clear cell, papillary the response rate is higher than in the past.

> It can lead to Complete Responses, Partial Responses, and Stable Disease. In the case of the latter, the tumor does not shrink, but it doesn't grow. That can let the patient get more surgery or perhaps radiation, as can Partial Response
>
> Doctors who do not give this treatment often do not understand it, so the fair assessment of whether you are a good candidate should come from an experienced hand.

Exhibit 9 at 3-4.

169.   By assuring patients that Proleukin is safer and more responsive than the FDA clinical trial results, Ms. Zuckerman was illegally promoting Proleukin off-label.

170.   In addition to employing paid spokespeople to promote Proleukin off-label, Defendant Prometheus also funded promotional programs to promote off-label uses of Proleukin.

171.   One such speaker event at Baton Rouge General Hospital was advertised for an off-label discussion topic but was attended primarily by patients. *See* Exhibit 7.

172.   Prometheus also employed a sales strategy of targeting less specialized physicians in order to bypass more knowledgeable oncologists.

173.   Typically, a urologist treating a patient for renal cell carcinoma will refer that patient to a specialized oncologist in an outpatient setting.

174.   Compared to urologists, oncologists are typically more informed about the use of Proleukin and other treatment options for advanced renal cell carcinoma or metastatic melanoma.

175. Many oncologists, in both an inpatient and outpatient setting, are reluctant to recommend treatment with Proleukin given the availability of arguably safer and/or more effective competitive treatments.

176. Prometheus urged employees to target urologists and recommend they refer patients directly to specific oncologists who operated in an inpatient setting and who were known by Prometheus to treat patients with high-dose IL2.

177. Prometheus trained employees on how to target urologists. One such training, titled "Maximizing RCC opportunity in Urology" was provided to Prometheus employees with the following objective: "By the end of this presentation the representative will gain a better understanding of a urology practice, common conditions treated, how they manage RCC and how to optimize IL-2 referrals." Exhibit 3 at 19.

178. Other training included "Building a Urology Sales call" where the objective provided, "By the end of this workshop the representative will gain a better understanding of the clinical need to IL-2 in a urology setting, what questions to ask the physician to uncover or develop that need and how to close that call for action." Exhibit 3 at 21.

179. Training materials also reflect that articles containing off-label information as well as articles that discuss information endpoints that were never tested, such as the Quinn articles as discussed above, were listed as resources for sales employees in training guides for urology based selling scenarios. *See e.g.,* Exhibit 3 at 33.

180. Prometheus also urged SAMs to discuss *High Dose interleukin-2 (Aldesleukin)-expert consensus on best management practices* by James P. Dutcher, et al., with targeted urologists. Exhibit 4 at 30-54.

181.   Over time, certain cancer centers, having been administering Proleukin for decades, became especially proficient in administering Proleukin and as such, these centers would typically yield fewer fatalities and better response rates.

182.   Prometheus directed employees to discuss the Dutcher article to urologists in order to present them with misleading information concerning favorable data and better response rates.

183.   In reality, the vast majority of treatment centers were not able to treat patients as proficiently as the centers studied in the Dutcher article.

184.   In an email dated September 23, 2015, Mr. Buonpastore, a Prometheus employee, specifically identified this scheme of targeting urologists in an effort to bypass middle-men oncologists who were unlikely to refer a patient for treatment with high-dose IL-2. As "Plan A." Exhibit 10.

185.   The off-label promotion of Proleukin by Defendant Prometheus raised safety issues, affected the treatment of patients, and undermined the FDA drug approval process.

186.   The promotion of an off-label use for a prescription drug can interfere with the proper treatment of a patient.

187.   Off-label promotion can lull a physician into believing that the drug being promoted is safe and effective for the intended off-label use, and that the FDA has approved the drug for that use.

188.   Thus, off-label promotion can cause a  doctor  and  patient to forgo treatment with an FDA-approved  drug that  has been  proven  to be safe and effective, and instead

substitute a treatment urged by the sales representative that has not been proven safe and effective, and which may in fact be harmful.

189.   Prometheus undertook this illegal off-label promotion for financial gain, despite the potential risks to patients.

190.   The off-label marketing schemes used by Prometheus induced doctors to write off-label prescriptions for Proleukin, causing the submission of false claims and the making of material false statements to government healthcare programs, resulting in improper payments by government healthcare programs.

191.   As a result of Defendant's off-label marketing, Defendant caused to be made false claims for reimbursement by Federal Healthcare Programs.

192.   As a result of Defendant's off-label marketing, Defendant caused to be made false records that were provided in support of false claims for reimbursement by Federal Healthcare Programs.

### B.   False / Illegal Marketing

193.   In conjunction with the other schemes described herein, Prometheus also engaged in false and illegal marketing of Proleukin.

194.   In many instances, the non-promotional and non-FDA approved publications used by Prometheus employees to promote off-label uses of Proleukin included false information that Prometheus employees then used to market the drug.

195.   Concerning the Quinn article, not only did Prometheus promote Proleukin off-label for a patient subset in which the drug is not indicated, but it also made a false claim about endpoint (stable disease) for which the drug was never studied or approved.

196.   In many instances, the spokespeople paid by Prometheus to promote Proleukin for off-label uses would provide fraudulent information in marketing.

197.   One such spokesperson, Peggy Zuckerman, is featured heavily in Prometheus marketing materials. *See* Exhibits 8 and 9.

198.   Ms. Zuckerman provided cancer patients with false and fraudulent information concerning Proleukin.

199.   In another instance of fraudulent marketing, Prometheus directed employees to pose as actual cancer patients on the SMART Patients website and instructed them to make false claims that Proleukin has improved their condition.

200.   Some SAMs would create profiles so they could monitor patient dialogue and posts and interact posing as patients.

201.   In another example of fraudulent marketing, Prometheus directed employees to search the PROCLAIM database in order to highlight and identify patients who had complete responses to Proleukin as "cures," categorize non-responders as emerging with stable disease, and bury morbidity data and data showing dangerous toxic level of the Adverse Events suffered by patients due to Proleukin use.

202.   This skewed information was then passed on the sales employees to use in sales tactics.

203.   As a result of Defendant's fraudulent marketing, Defendant caused to be made false claims for reimbursement by Federal Healthcare Programs.

204. As a result of Defendant's fraudulent marketing, Defendant caused to be made false records that were provided in support of false claims for reimbursement by Federal Healthcare Programs

205. The fraudulent marketing schemes used by Prometheus caused the submission of false claims and the making of material false statements to government healthcare programs, resulting in improper payments by government healthcare programs.

### C.   Conspiracy to Miscode

206. In conjunction with other schemes described herein, Defendant Prometheus instructed providers to deliberately miscode DRG codes to allow the hospitals to receiver higher reimbursement from Government healthcare programs.

207. Hospitals treating patients with Proleukin high-dose IL-2 may code MS-DRG 837 or MS-DRG 838.

208. Code 837 is coded for chemotherapy with acute leukemia as secondary diagnosis or with high dose chemotherapy agent with major complications or co-morbidities.

209. Code 838 is coded for chemotherapy with acute leukemia as secondary diagnosis with complications or co-morbidities or with a high dose chemotherapy agent.

210. Code 837 should not be used for the usual complications typically associated with high dose IL-2 Proleukin treatment.

211. Prometheus directed SAMs to directly contact hospitals and ask if the hospital was happy with the level of reimbursement they were currently receiving for IL-2 Proleukin treatments.

212.  Prometheus directed employees to instruct the hospital to incorrectly code all high-dose IL-2 Proleukin treatments as MS-DRG 837, regardless of whether the patient actually experienced major complications or co-morbidities. *See* Exhibit 11.

213.  Upon instruction from Prometheus, hospitals would document specific complications that would support the fraudulent MS-DRG 837 coded claims, regardless of whether these side effects actually took place.

214.  As a result of Defendant's instruction to deliberately miscode, Defendant caused to be made false claims for reimbursement by Federal Healthcare Programs.

215.  As a result of Defendant's unlawful instruction to document complications in support of the miscoding, Defendant caused to be made false records that were provided in support of false claims for reimbursement by Federal Healthcare Programs and/or impacted reimbursements under Part A.

216.  The fraudulent miscoding schemes used by Prometheus caused the submission of false claims and the making of material false statements to government healthcare programs, resulting in improper payments by government healthcare programs.

### D.  **Kickbacks**

217.  In conjunction with the scheme described above, Prometheus also participated in a fraudulent kickback scheme.

218.  In an email dated September 23, 2015, Mr. Buonpastore, a Prometheus employee, specifically identified this scheme of targeting urologists in an effort to bypass middle-men oncologists who were unlikely to refer a patient for treatment with high-dose IL-2. As "Plan A." Exhibit 10.

219.  In this email, Mr. Buonpastore commends Jennifer Wyatt's sales tactics.

220.  According to Mr. Buonpastore's observations, Ms. Wyatt spoke with two urologists in her region, each of whom were treating a candidate for high-dose IL-2 treatment.

221.  Ms. Wyatt gave each of these urologists the cell phone number for Dr. Howard Kauffman, an oncologist known to treat patients with high-dose IL-2 at Robert Wood Johnson University Hospital.

222.  Mr. Buonpastore points out that it is particularly noteworthy that Ms. Wyatt texted Dr. Kauffman letting him know that he may receive inquiries from these urologists about their patients for possible IL-2 treatment.

223.  As Mr. Buonpastore explained, "it lets Treaters know that we are out in the [sic] territories trying to increase referrals to their centers, and that by them knowing this, may [sic] be more inclined to consider Proleukin® therapy *first - before any clinical trial ,* and secondly we are trying to send them patients their way." Exhibit 10.

224.  Ms. Wyatt created a tit-for-tat relationship with preferred oncologists in violation of the Federal Anti-Kickback Statute. *See* 42 U.S.C. §1320a-7b(b).

225.  Prometheus made concerted efforts to influence specific oncologists to treat patients with Proleukin and, in exchange, Prometheus provided the physician with free marketing in order to increase their referrals.

226.  As explained in Mr. Buonpastore's email: "So- the take home message is that if you do have the cell phones of your Treaters (highly recommended), and your community docs tell you that they made send their patients directly to the Treaters- **let them know that.** It could pay off……" Exhibit 10 (emphasis in original).

227.  Prometheus also targeted urologists for marketing in an attempt to induce referrals to treatment centers already using Proleukin in a profitable way.

228.  Inpatient facilities that regularly administer Proleukin also have an economic interest to promote the use of Proleukin because Proleukin can only be administered in an inpatient setting, whereas competitive drugs may be administered in an outpatient setting.

229.  Prometheus routinely targeted urologists and induced referrals to specific treatment centers using off-label marketing, and false and misleading information about Proleukin.

230.  As a result of Defendant's kickback scheme, Defendant caused to be made false claims for reimbursement by Federal Healthcare Programs.

231.  As a result of Defendant's kickback scheme, Defendant caused to be made false records that were provided in support of false claims for reimbursement by Federal Healthcare Programs.

232.  The kickback schemes used by Prometheus caused the submission of false claims and the making of material false statements to government healthcare programs, and resulting in improper payments by government healthcare programs.

**E.   Retaliation**

233.  Relator began working for Prometheus on August 11, 2014.

234.  During his tenure with Prometheus, Relator was promoted to Senior Manager of Sales Training on October 2, 2017, a position he held until his termination on January 18, 2018.

235.  As part of his employment duties, Relator worked in the field with Strategic Account Managers (SAMs).

236.   While working in the field with the SAMs, Relator noticed that the majority of SAMs were engaging in the fraudulent schemes as described above.

237.   Relator documented his concerns about the fraudulent activity in a field report that he intended to submit to his supervisor Tim Thompson per company policy.

238.   When Relator personally notified his supervisor, Tim Thompson, of the fraudulent activity he witnessed and his intent to submit a field report, Mr. Thompson told Relator not to submit a report, even though submission of a field report was mandated by Defendant's own corporate policy.

239.   Instead, Thompson instructed Relator that in the future, and despite corporate policy, he should not submit any reports until further notice and further directed Relator to communicate with him only by phone to discuss the fraudulent activity.

240.   Concerned about the fraud he observed and the secretive and complicit attitude exhibited by Mr. Thompson, Relator decided to further report his concerns up the chain of command to Jenny Alonzo, General Counsel, Chief Compliance Officer, and acting Director of Human Resources and Cherrie Green of Clinical Affairs on or about December 7, 2017.

241.   During this meeting, Ms. Alonzo admitted to Relator that compliance training was needed and she agreed to collaborate with Relator in order to conduct the additional compliance training at the National Sales Meeting in February.

242.   However, Relator was alarmed by Ms. Alonzo's cavalier and complicit attitude during this meeting. At one point during the December 7, 2017 meeting with Relator and Ms. Alonzo,  Ms. Alonzo was able to guess the name of one of the employees participating

in the fraudulent activity based on Relator's description and laughingly admitted that that individual, Mr. Buonpastore, had been chronically out of compliance for years.

243.  Relator also communicated the fraud he observed to Kathleen Heffernan, an outside regulatory consultant via conference call.

244.  Relator also caused to be scheduled a meeting with General Manager Bram Goorden on December 8, 2017 to discuss his concerns about the fraud he witnessed, but Mr. Goorden canceled the meeting at the last minute.

245.  Following Relator's actions reporting the activity up the chain of command described above, Relator's supervisor Mr. Thompson cancelled all calls with Relator and quit responding to Relator's emails.

246.  Soon after, on January 18, 2018, Defendant terminated Relator's employment in retaliation for engaging in the protected conduct described above.

## VIII.   CLAIMS

### A.   Submission of False Claims

247.  On information and belief, the schemes facilitated by Prometheus caused the submission of false claims and the making of material false statements to government healthcare programs, resulting in improper payments by government healthcare programs.

248.  Beginning at least as early as 2014 and continuing until the present, Prometheus knowingly and fraudulently caused the submission of false claims and the making of material false statements to government healthcare programs, resulting in improper payments by government healthcare programs for the drug Proleukin.

249.  Promotion for off-label uses of Proleukin was facilitated by Prometheus and accomplished through various tactics and techniques, including but not limited to: (1) directing employees to distribute and emphasize non-promotional and non-FDA approved publications; (2) directing sales employees to emphasize off-label information such as misleading response rates, information pertaining to combination therapy despite the fact Proleukin was only approved for monotherapy uses, and information pertaining to off-label dosing, despite the fact Proleukin was never approved by the FDA for such use or such doses; (3) funding promotional programs and paying spokespeople to promote off-label uses of Proleukin; and (4) targeting physicians who are considered non-experts in renal cancer.

250.  The off-label promotion scheme facilitated and pushed by Prometheus was designed to intentionally mislead prescribers, end users, and patients into thinking Proleukin was comparable to newer, better drugs when Defendant knew that it was not.

251.  Prometheus also provided fraudulent, unsolicited and misleading (often dangerously so) information as part of a multi-faceted scheme to promote Proleukin.

252.  Prometheus engaged in a scheme of illegal kickbacks including with specific urologists and oncologists as part of a multi-faceted scheme to promote Proleukin.

253.  Prometheus engaged in a scheme of instructing miscoding at certain facilities with particular codes in order to push rampant sales of Proleukin.

254.  As a result of these schemes, Defendant caused to be made false claims for reimbursement by Federal Healthcare Programs.

255.   As a result of these schemes, Defendant caused to be made false records that were provided in support of false claims for reimbursement by Federal Healthcare Programs.

256.   Relator has direct, first-hand knowledge of false claims being submitted as a result of Defendant's fraudulent actions gained through his employment with Defendant.

### B.   <u>Scienter</u>

257.   At all relevant times, Prometheus acted knowingly– that is, with actual knowledge, in deliberate ignorance, or with reckless disregard– with respect to the fact that it was causing to be submitted or submitting false claims to government health care programs as alleged here, and that it was making false records or statements material to false claims or to get claims paid.

258.   Prometheus devised and facilitated a multi-faceted off-label marketing scheme, a fraudulent marketing scheme, a kickback scheme, and a miscoding scheme, all of which were purposefully designed in order to aggressively increase sales of Proleukin,

259.   The introduction of newer and safer drugs such as Torisel, Yervoy, Votrient, Opdivo, and Keytruda, as described in detail above, created market pressures and internal demands within Prometheus to grow the sales of Proleukin in the face of shrinking market-share and relative efficacy.

260.   Defendant trained and rewarded sales staff for off-label promotion.

261.   Prometheus set aggressive quotas for sales representatives that effectively could only be reached by promoting Proleukin off-label.

262.   Prometheus compensated sales representatives through sales quotes and a bonus structure designed to encourage off-label promotion.

263. Prometheus also trained sales representatives on fraudulent marketing and targeting urologists as part of a kickback scheme.

264. Prometheus also trained employees on how to facilitate the miscoding scheme.

### C.  **Materiality**

265. The misrepresentations made to the government as described above were material as they had a natural tendency to influence, or be capable of influencing, the payment or receipt of money or property. *See* 31 U.S.C. §3729 (b).

266. As described above, during the time period relevant to this Complaint, Prometheus caused the submission of claims for off-label uses that were ineligible for reimbursement by Medicaid, Medicare, and other federal healthcare programs because the uses were neither FDA-approved nor supported by the applicable Compendia.

### CAUSES OF ACTION

**FIRST CAUSE OF ACTION**
(False Claims Act: Presentation of False Claims) (31 U.S.C. § 3729 (a)(1)(A))

267. Relator restates and incorporates by reference paragraphs 1 through and including 266 above as if fully set forth herein.

268. The FCA imposes liability on any person who knowingly presents, or causes to be presented, to the United States for payment or approval any false or fraudulent claims for reimbursement. 31 U.S.C. § 3729 (a)(1)(A).

269. By virtue of the acts described above, Defendant knowingly presented, and caused to be presented, materially false and fraudulent claims for payment or approval to the

United States, including claims to Medicaid and Medicare for reimbursement for Proleukin.

270. Defendant presented or caused to be presented such claims with actual knowledge of their falsity, or with reckless disregard or deliberate ignorance of whether or not they were false.

271. The United States, unaware of the falsity of the records, statements, and claims made or submitted by Defendant, and in reliance on the accuracy thereof, paid and continues to pay for claims that would otherwise not have been paid if the truth were known.

272. The United States sustained damages because of Defendant's wrongful conduct.


## SECOND CAUSE OF ACTION
### (False Claims Act: Making and Using False Records and Statements to Get False Claims Paid) (31 U.S.C. § 3729(a)(1)(B))

273. Relators restates and incorporates by reference paragraphs 1 through and including 266 above as if fully set forth herein.

274. The FCA imposes liability on any person who knowingly makes, uses or causes to be made or used false records or statements material to a false or fraudulent claim presented to the United States for payment or approval for reimbursement. 31 U.S.C. § 3729(a)(1)(B)).

275. By virtue of the acts described above, Defendant knowingly made, used, and caused to be made or used false records or statements– i.e., the misrepresentations made and caused to be made by Defendant when submitting the false claims for payments and the

false certifications made by Defendant in submitting claims for reimbursement for Proleukin– to get false or fraudulent claims paid and approved by the United States, and that were material to the United States' payment of the false claims at issue in this case.

276. Defendant's false certifications and representations were made for the purpose of getting false or fraudulent claims paid by the United States, and payment of the false or fraudulent claims by the United States was a reasonable and foreseeable consequence of Defendant's statements and actions.

277. The false certifications and representations made and caused to be made by Defendant were material to the United States' payment of the false claims.

278. Defendant made or caused such false records or statements with actual knowledge of their falsity, or with reckless disregard or deliberate ignorance of whether or not they were false.

279. The United States, unaware of the falsity of the records, statements, and claims made or submitted by Defendant, and in reliance on the accuracy thereof, paid and continues to pay for claims that would otherwise not have been paid if the truth were known.

280. The United States sustained damages because of Defendant's wrongful conduct.


### THIRD CAUSE OF ACTION
#### (False Claims Act: Retaliation) (31 U.S.C. § 3730(h))

281. Relator restates and incorporates by reference paragraphs 1 through and including 266 above as if fully set forth herein.

282. Relator's actions in bringing the truth about Defendant's fraud to the attention of

Relator's superiors led to the retaliatory termination of Relator.

283.  Defendant retaliated against Relator for engaging in the protected conduct referenced above.

284.  Defendant terminated Relator in retaliation for Relator's efforts to prevent one or more violations of 31 U.S.C. § 3729 et seq.

285.  As a result of the foregoing, Relator has suffered damages because Defendant violated 31 U.S.C § 3730(h).

## FOURTH CAUSE OF ACTION
### (State False Claims Act)

286.  Relator restates and incorporates by reference paragraphs 1 through and including 266 above as if fully set forth herein.

287.  By virtue of the acts described above, Defendant  knowingly caused to be presented false claims for Medicaid reimbursement, caused to be created false records to support false claims for Medicaid reimbursement, and/or conspired to violate provisions of the State False Claims Act in violation of Fla. Stat. Ann.§ 68.081, *et seq.*

288.  By virtue of Defendant's unlawful conduct, the State of Florida has suffered damages and therefore are entitled to multiple damages under the State False Claims Act, to be determined at trial, plus civil penalties as specified by statute.

## PRAYER FOR RELIEF

WHEREFORE, Relator requests the following relief as to Counts I, II, III, and IV in favor of the United States of America against Defendant Prometheus Laboratories, Inc.:

1.      Judgment for violations of the False Claims Act set forth above, in an amount equal to three times the amount of damages the United States has sustained because of Defendant's aforementioned actions, plus civil penalty of not less than Five Thousand Five Hundred Dollars ($5,500.00), but not more than Eleven Thousand Dollars ($11,000.00), for each violation, plus three times the amount of damages which the United States has sustained, pursuant to the False Claims Act  31 U.S.C. §3729(a);

2.      Reimbursement to Relator of all reasonable expenses which the court finds have necessarily been occurred, plus reasonable attorneys' fees and costs;

3.      All damages incurred by the Relator as a result of the unlawful retaliation;

4.      Any other and further relief as the court deems just and proper.

**JURY TRIAL DEMAND**

Relator, individually and on behalf of the United States of America, demands jury trial on all claims alleged herein.

Respectfully submitted,

Dated: August 28, 2020

*/s/ Stephen S. Stallings*
Stephen S. Stallings, Esq.
PA ID No. 205131

The Law Offices of Stephen S. Stallings, Esq.
310 Grant Street, Suite 3600
Pittsburgh, PA 15219
Tel:  (412) 322-7777
Fax: (412) 322-7773
attorney@stevestallingslaw.com

*Attorney for Relator*